Algie L. **OUTLAW** and Meaka S. Outlaw

v.

The **UNITED STATES**.

No. 125-72.

United States Court of Claims.
April 17, 1974.

Henry C. Lowenhaupt, St. Louis, Mo., atty. of record, for plaintiff. Owen T. Armstrong and Lowenhaupt, Chasnoff, Freeman, Holland & Mellitz, St. Louis, Mo., of counsel.

Richard D. Silvester, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr., and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, and SKELTON, Judges.

## OPINION

SKELTON, Judge.

This is a suit for the refund of income taxes and interest in the sum of $7,512.34, paid by the plaintiff under protest for the calendar years 1965, 1966, and 1967. The plaintiff, Algie L. Outlaw, joined by his wife, Meaka S. Outlaw, brings this suit.[1]

The facts giving rise to this suit, all of which are stipulated by the parties, are generally described as follows, although the details of such facts will be more fully discussed under the various headings of this opinion set forth below. This method of handling the facts is for the purpose of shortening the opinion and avoiding a duplication of such facts.

The plaintiff, along with 40 other persons, organized a venture on January 15, 1965, by the execution of two agreements. The first was designated the "Cherry Hill Agreement" which was comprised of three groups of people as follows:

1. *Real Estate Investors Group.* This group was originally composed of 27 persons and ultimately 41 individuals of whom the plaintiff was one. They furnished the money for the venture which will be later described.

2. *Founders Group.* This group was composed of six persons who were experts in agriculture and agronomy who were to furnish expert agricultural advice and supervision of the work of the venture.

---

1. Meaka S. Outlaw is plaintiff by virtue of the fact that she signed a joint income tax return with her husband, Algie L. Outlaw.

The term "plaintiff" used herein refers only to Algie L. Outlaw.

3. *Financing Group.* This group consisted of 13 persons who were on a standby basis and who were to be activated only in the event of successful future development of growing bamboo for the paper pulp industry.

The second instrument entered into by the persons composing the venture was an indenture of trust called "Cherry Hill Trust No. 1," which was entered into by the plaintiff and the other persons in the venture with the Citizens and Southern National Bank of Savannah, Georgia, as trustee. These two instruments are referred to in the stipulation of facts as the "Constituent Instruments." Each of them incorporated the other by reference.

The Trust was formed for the ownership of record title to, and management of, certain farm lands for investment in Georgia. The trustee was specifically empowered to engage in agriculture on those lands. An operating committee was established to give instructions to the trustee and the trustee acted upon directions received from the operating committee. The trustee engaged in farming operations including the commercial farming of row crops (lettuce, celery, onions, beets, radishes, okra, and the like) including the growing and marketing of fresh produce which was harvested and sold to local chains and markets on the eastern seaboard. At the same time, the trustee, acting through the founders group, engaged in experimental growing of bamboo looking toward developing it for paper pulp purposes.

During each of the years 1965, 1966, and 1967, the Trust sustained net operating losses. These losses were allowed to flow through the Trust to the plaintiff and the other 40 persons in the venture and they deducted such losses from their Federal income tax returns. The Internal Revenue Service audited the income tax returns of the 41 individuals involved and ruled that the Trust was an association taxable as a corporation and accordingly was required to deduct the losses as such for the years in question and that the plaintiff and the other individuals in the venture were not entitled to take their pro rata share of such losses as deductions on their individual income tax returns. The present suit is maintained only by the plaintiff, Algie L. Outlaw, however, a final decision on the tax liability of the other 40 persons in the venture is being held in abeyance awaiting the outcome of this suit by the plaintiff.

The question in this case is whether the Cherry Hill Trust is an association taxable as a corporation under Section 7701(a)(3) of the Internal Revenue Code of 1954. If it is such an association, then it is the entity which must take deductions for any tax losses for the years in suit. If not, then the plaintiff can deduct his pro rata share of such losses under Section 671 of the Internal Revenue Code of 1954 which would allow the pass-through of income and losses to trust beneficiaries. We have carefully considered the facts and the law involved in this case and have concluded that the decision of the Internal Revenue Service was correct and that the plaintiff is not entitled to recover.

The Internal Revenue Code defines a corporation to include "associations, joint-stock companies, and insurance companies." Section 7701(a)(3). Associations are further defined in the Treasury Regulations, Section 301.7701–2 [2] in pertinent part as follows:

(a) Characteristics of corporations.

(1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of a major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organi-

---

2. All references herein to Regulations are to Treasury Regulations.

zations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey et al. v. Commissioner (1935) 296 U.S. 344 [56 S.Ct. 289, 80 L.Ed. 263].

(2) Since associates and an objective to carry on business for joint profit are essential characteristics of all organizations engaged in business for profit (other than the so-called one-man corporation and the sole proprietorship), the absence of either of these essential characteristics will cause an arrangement among co-owners of property for the development of such property for the separate profit of each not to be classified as an association. * * *

As may be seen from the above-quoted Regulation, the Supreme Court decision in the case of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935), was the basis for the Treasury Regulations and that decision and the Regulations control the disposition of this case. The *Morrissey* case involved a situation where a Trust was created for the purpose of developing certain tracts of land and constructing and operating a golf course. The trustees were empowered to buy, sell, lease, and operate the land owned by the Trust and to construct and operate the golf course, club houses, and to receive rents, profits, and income and to make loans, investments, and regulations and to manage the trust estate as if they were the owners. They had no power to bind the beneficiaries personally. Interests in the Trust were freely transferable. The death of an investor or a trustee was not to end the Trust, which was to continue for 25 years. The land was developed by the Trust and some of it was converted into lots and sold. The golf course and club house were constructed on the rest of the property and conveyed to a corporation in exchange for its stock. For a time the trustees leased the golf course from the corporation and operated the golf facilities, but later the activities of the trustees were confined to the collection of installments on previous sales, the sale of other parts of the land, and the receipt of dividends from the golf course and the disposition of money to the beneficiaries of the Trust. The court held that the venture was a business trust organized for the operation of a business for the benefit of the beneficiaries. In that case, the Supreme Court enumerated the factors necessary for the taxation of a venture as a corporation as follows:

3. "Association" implies *associates*. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. * * * [Emphasis supplied.] [296 U.S. at 356, 56 S.Ct. at 295.]

* * * * * *

What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, *holds the title to the property* embarked in the corporate undertaking. Trustees, as a continuing body

with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a *centralized management* through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise—who act "in much the same manner as directors"—may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be *secure from termination or interruption by the death of owners of beneficial interests* and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, *the transfer of beneficial interests without affecting the continuity of the enterprise,* and also the introduction of large numbers of participants. The trust method also permits the *limitation of the personal liability of participants to the property embarked* in the undertaking. [296 U.S. at 359, 56 S.Ct. at 296.] [Emphasis supplied.]

In our opinion, the *Morrissey* case is on all fours with the case before us. In that case, as well as in our case, the characteristics of the venture or entity must be compared with those of a corporation. It can be taxed as a corporation even though it is not identical in every respect with a corporation. The Supreme Court in the *Morrissey* case stated that "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." [*Id.* at 357, 56 S.Ct. at 295.] Treasury Regulation Section 301.7701–2(a)(3) states:

An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics. * * *

Consequently, it becomes necessary to compare the Cherry Hill Trust in the instant case with the corporate characteristics described in the *Morrissey* case and in the Treasury Regulations. It is clear from that case and the Regulations that an association will be taxed as a corporation rather than as a general trust or a partnership if it has the following characteristics:

1. Associates.

2. An objective to carry on business and divide the gains therefrom.

3. Continuity of Life.

4. Centralization of Management.

5. Liability for Corporate debts limited to corporate property.

6. Free Transferability of Interests.

We shall now consider whether or not the Cherry Hill Trust in the instant case had most, if not all, of these characteristics and more nearly resembled a corporation than a general trust or a partnership as follows:

■ 1. *Associates.* It is clear that the trust had associates. Originally it had 27 participants and later on this number was increased to 41. They were members of the real estate investors group and provided the capital funds for the venture. The plaintiff has contended that associates must be numerous in number. We do not agree. *See* Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935) where it was held that only two associates were sufficient for an association. *Also see* Helvering v. Coleman-Gilbert, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278 (1935) where only five associates were held to be sufficient.

2. *Objective to Carry on Business and Divide the Gains Therefrom.* It will be seen from Section 301.7701–

2(a)(2) that a venture will not be classified as an association unless it has both associates and an objective to carry on business for joint profit. The absence of either of these characteristics will cause the venture not to be classified as an association. We have already shown that the Trust in the instant case had associates. We will now proceed to examine the business objective of the venture. The Supreme Court stated in the *Helvering* case that the purpose of a venture is to be determined by referring to the agreement of the parties. In this regard, the Supreme Court stated:

> * * * The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted. * * * [*Id.* at 374, 56 S.Ct. at 287.]

An examination of the Cherry Hill Agreement and the Cherry Hill Trust, the constituent instruments in this case, shows without a doubt that the Trust was established for a business purpose. These instruments show that the purpose of the Trust was "to exploit agricultural lands in the State of Georgia" and "to provide for the holding of record title to real estate, ownership of machinery and equipment, accounting of receipts and disbursements relative thereto, and their respective interests in the agricultural projects contemplated."

The trustees were empowered to:

> [A]cquire farm lands in the State of Georgia with or without improvements, and farm and construction machinery, equipment and implements, and *to engage in agriculture upon such lands,* and to improve them and to demolish existing improvements, * * * [to] employ and discharge agents, employees, advisors, attorneys and others, * * *. [Emphasis supplied.] [Ex. 1 at 2.]

The trustees were instructed to allow the Founders Group to use the land owned by the trust estate for the purpose of experimenting with the commercial planting of grasses, bamboos, row crops, cereal crops, timber, and wood or other like or different crops.

The Cherry Hill Agreement stated the purpose of the trustee's business objective to be:

> [T]o invest in agricultural lands in the State of Georgia, and cause the same *to be cultivated and to raise crops of commercial value, and generally to exploit such lands as farm lands;* * * *. [Emphasis supplied.] [Ex. 2 at 1.]

Also, such agreement provided:

> The present interest of the Real Estate Investors Group is *primarily in owning, developing and exploiting agricultural lands for income.* [Emphasis supplied.] [Ex. 2 at 3.]

It is significant that prior to the execution of the Cherry Hill Agreement and the Cherry Hill Trust, an offering memorandum was prepared by a firm of securities dealers and brokers in St. Louis, Missouri, which was distributed to the plaintiff and other investors, which described the purpose of the investment and the possible yield and profits as follows:

> The investors' holding through Beneficial Interests of the Trust will initially consist of a participation in commercial farming of row crops (lettuce, celery, onions, beets, radishes, okra, and the like) which, if successful, yield high profits per acre.
> * * *

It was further stated in Section V that—

> During the first two years major emphasis will be on the establishment of a commercial agricultural operation (stage one) in the growing and marketing of fresh produce. * * * These products will be sold, in most instances under advance contract, to local chains and to markets on the eastern seaboard.
> * * * * * *
> Results of the experience of the first two years should determine

whether the emphasis would continue to be solely on commercial produce farming or, whether, in addition, there should be included bamboo growing and pulping. * * *

\* \* \* \* \* \*

In the event results of commercial produce farming are sufficiently attractive to warrant its continued expansion, it may also be necessary to raise additional equity capital. * * *

It has been held that where an entity is given the power to conduct a business in the instrument which creates it, such evidence is sufficient to prove a business objective. *See* Helvering v. Coleman-Gilbert, *supra,* and Abraham v. United States, 406 F.2d 1259 (6th Cir. 1969). It would seem that this requirement has been met by the foregoing facts. However, it is proper to consider whether or not the venture actually engaged in business activities. We are convinced that such is the case. For instance, the facts show that the Trust ultimately owned more than 10,000 acres of land, 400 acres of which was actively cultivated and crops were raised thereon and 1,000 acres of the land was utilized in the bamboo experimental project. The Trust employed from 18 to 20 full time employees plus 60 to 70 temporary workers during harvest season. It also employed full time managers, accountants, and an agronomist. The operation reports of the managers showed an active business was conducted in the hiring and firing of employees, buying, selling, and exchanging land, buying farm equipment, feed and fertilizer, and selling harvested crops. Substantial sums were shown as "business expenses." The plaintiff has contended that the only purpose of the Trust was to hold title to the property of the venture for the benefit of the beneficiaries as an investment on their behalf. We disagree. In face of the foregoing facts, it is clear to us that the investors had an objective to carry on business through the Trust, and in fact did so. Furthermore, they intended to divide the gains from the business conducted by the Trust if there were any. Paragraph 28A of the Stipulation of Facts so provides.

3. *Continuity of Life.* Section 301.-7701–2(b) provides as follows:

(b) Continuity of life. (1) An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization. * * *

\* \* \* \* \* \*

(3) An agreement establishing an organization may provide that the organization is to continue for a stated period or until the completion of a stated undertaking or such agreement may provide for the termination of the organization at will or otherwise. * * * [I]f the agreement provides that the organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement is that no member has the power to dissolve the organization in contravention of the agreement. * * *

The Cherry Hill Trust provided that it was to exist for ten years. There was no provision in the constituent instruments that allowed an investor to terminate the organization at will. Furthermore, he could not do so under state law in violation of the agreement. As a matter of fact, one investor, W. Mac-Lean Johnson, died during the first year of the Trust, but his death had no effect whatever on the existence of the Trust. Consequently, in our opinion, the Cherry Hill Trust had continuity of life within the meaning of the Regulations and decided cases.

4. *Centralization of Management.* Section 301.7701–2(c) of the Regulations provides as follows:

(1) An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the

conduct of the business for which the organization was formed. * * *

In this case, the management of the Trust was placed in the hands of an operating committee which gave instructions to and supervised the trustee with respect to farming, land reclamation, and the bamboo project. This committee met periodically to formulate policies for the Trust and to make decisions regarding the acquisition and use of land and the expenditures of money for equipment and other expenses of the Trust. The committee was authorized to replace its members who died or resigned and actually did so when one of its members, W. MacLean Johnson, died. The committee occupied itself with the everyday activities of the Trust requesting information and giving advice, instructions, and authorizations to the trustee and local managers regarding the activities of the venture. The argument of the plaintiff that the operating committee was not the agent of the trustee nor responsible to it is beside the point. We are only concerned with whether or not the trust *resembles* a corporation, not whether it is identical in all respects to a corporation. The Regulations do not require that an agency relationship must exist between management and the trust. We are of the opinion that centralization of management existed in this case.

5. *Limited Liability.* Section 301.-7701-2(d)(1) provides as follows:

(1) An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. * * *

The original indenture of trust provided as follows:

* * * [N]o member of the Real Estate Investors Group shall be required to pay any further amount to the Trust Estate in excess of amounts previously, within one year then last past, paid to him from the Trust Estate, unless and except to the extent

that he shall be obligated to do so by his own individual agreement or undertaking.

This provision no doubt was meant to limit the investor's liability and was so understood by them, because in 1965 two of the investors guaranteed bank loans for the Trust. Such a guarantee would not have been necessary if the plaintiff and other investors had unlimited liability for the debts of the Trust. In 1966, the indenture of trust was amended to provide as follows:

D. The beneficiaries of this Trust shall not be individually liable beyond their respective proportionate interest in the assets of the Trust for any action, omission, contract, debt or claim incurred by or arising from the operation of the Trust as contemplated by the Trust Indenture.

This amendment is further proof that the investors were doing everything possible to limit their liability for the debts of the Trust. Nevertheless, it is agreed by all parties that local law determines the question of limited liability. In the case of National City Bank v. First National Bank, 193 Ga. 477, 19 S.E.2d 19 (1942), the Supreme Court of Georgia recognized the general rule that beneficiaries are not usually liable for obligations of a trust citing 2 Bogert on Trusts 977, § 294. However, the court stated at page 489, 19 S.E.2d at page 26 as follows:

* * * It is uniformly held that if the cestuis may dictate on questions of the management of the trust, they are liable for the debts. * * *

■ This statement requires consideration of the question of whether the investors in the Trust managed the business or whether the business was managed by the operating committee. It appears that the operating committee was not elected by the investors. In the beginning this committee consisted of five individuals and was established to give instructions to the trustee. The trustee and the founders group acted under the supervision of this committee. The

committee was authorized to appoint successors of any member of the committee who died, resigned, or became incapacitated, and they were not limited in their choice to someone already connected with the Trust. .This procedure was followed as shown by the appointment of a successor to W. MacLean Johnson, a member of the committee who died. Therefore, it appears that the operating committee which managed the business of the venture was for all practical purposes a self-perpetuating autonomous body. Under this arrangement, the trustee was not the agent of the investors. Furthermore, the investors did not control the trustee nor the business of the undertaking. This was left to the operating committee. Under these circumstances, it seems clear that the investors were not liable for the debts of the Trust. Further proof of this fact is shown by the purchase by the Trust of an insurance policy in the sum of $1,000,000 covering liability for its debts. It is hardly likely that such a policy would have been taken out if the investors were personally liable for its obligations. The plaintiff contends that the investors were personally liable for the debts of the Trust under the local laws of Georgia and that the insurance policy was taken out to protect them from such personal liability. While this is a good argument, it is unpersuasive. Under all the facts and circumstances, we think the investors were not liable for the debts of the Trust; and even if they were, as pointed out below, such liability alone would not prevent the Trust from being classified as an association taxable as a corporation.

6. *Free Transferability of Interest.* In this case the investors either purchased one or more "beneficial interest" at $25,000 each, in the Trust, or purchased a six percent note. This provided the initial capital for the Trust. In 1966 all of the note holders exchanged their notes for "beneficial interests."

Section 301.7701–2(e)(1) provides as follows:

(1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization. * * *

The facts show that the investors in the Trust were able to transfer their entire interests without the consent of anyone, provided they first gave notice to the trustee. However, if an investor wished to transfer less than his entire interest, he was required to have the consent of the trustee. In such an event, the trustee could not refuse to consent to such an assignment unless it believed that the assignment would substantially increase the expenses or burden of administering the Trust. The facts show that on three different occasions interests of investors were actually transferred, and there is no evidence that an investor was ever prevented from transferring his interest. The requirement that notice be given to the trustee before assigning an interest appears to have been a mere formality and not a restriction on the free transferability of an interest. The Regulations further provide that if an investor must have the consent of other members or if he must first offer his interest to the other members at its fair market value, a modified form of free transferability of interests exists. The provisions of the trust in the instant case do not so provide, and even if they did, this would not necessarily prevent the Trust involved in this case from being an association taxable as a corporation. Such a situation would be a condition that would have to be considered in determining whether the venture resembled a corporation more than a trust or a partnership.

In the *Morrissey* case, the Supreme Court did not state how many of the corporate characteristics a venture must have before it ·would be considered an

association taxable as a corporation. However, the court did say:

> 4. The inclusion of associations with corporations implies resemblance: but it is resemblance not identity. * * * [296 U.S. 357, 56 S.Ct. 295.]

The Regulations provide with respect to this question:

> (3) An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics. * * * [301.7701-2(a)(3)]

■ We have already pointed out that the existence of associates and a business objective are the only two characteristics *required* by the Regulations before an organization will be considered an association. Consequently, if the organization has two or more of the four remaining corporate characteristics, making a total of four or more of the six listed in the Regulations, it will be treated as an association taxable as a corporation. The foregoing discussion of the facts in this case indicate that the Trust had all six of the listed characteristics of a corporation. The two most favorable to the plaintiff are those with respect to limited liability and free transferability of interest. Nevertheless, as stated above, we think those two characteristics more nearly resemble corporate characteristics than those of a general trust or a partnership. But even if this were not so with these two characteristics, the other four definitely are corporate in character and would be sufficient to classify the Trust as an association. It should be pointed out that in Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935), an organization was classified as an association even though only a modified form of free transferability of interest existed. In Cooper v. Commissioner, 262 F.2d 530 (10th Cir. 1958), cert. denied, 359 U.S. 944, 79 S.Ct. 724, 3 L.Ed.2d 677 (1959), an entity was found to be an association even though it lacked the characteristic of limited liability of investors and had only a modified form of free transferability of interest.

Section 301.7701-2(a)(1) provides in pertinent part:

> * * * In addition to the major characteristics set forth in this subparagraph, [i.e., the six listed above] *other factors may be found* in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. [Emphasis supplied.]

■ In the instant case at least two other factors appear to be significant. These are: (1) the fact that the Trust was authorized and able to acquire title to real estate and personal property and to sell and exchange it and to otherwise deal with it as its own as a corporation would do; and (2) the financing of the Trust was promoted in the beginning by the preparation and distribution of an offering memorandum or prospectus prepared by a firm of securities brokers who were paid a fee for their work, which was similar to the method used by many corporations to obtain initial capital. These factors are additional corporate characteristics. *See* Morrissey v. Commissioner, *supra,* and Harrison Property Management Co. v. United States, 475 F.2d 623, 201 Ct.Cl. 77, (1973), cert. denied, 414 U.S. 1130, 94 S. Ct. 868, 38 L.Ed.2d 754 (1974).

The plaintiff argues that the Trust in this case should be classified as a partnership or a general trust instead of an association. Considering the partnership argument first, it is readily apparent that the entity here is not a partnership because as such it could not meet the requirements of *Morrissey* nor of the Regulations. While it is true that a partnership complies with two of the requirements, namely (1) associates (partners), and (2) a business objective, it totally lacks the other four characteristics. For instance, there is no continuity of life because the death of a partner or the assignment of his interest dissolves the partnership. There is no centralization of management because each partner has an equal voice in the affairs of the partnership. Limited lia-

bility does not exist, as each partner is liable under local law for all partnership debts. There is no free transferability of interest within the meaning of the Regulations because no partner can substitute for himself in the partnership an outsider without the consent of the other partners. Even if such consent is obtained and the substitution is made by the assignment of the interest of the retiring partner, the old partnership is dissolved and a new one is formed between the remaining partners and the new partner. Thus, it is clear that the Trust in the instant case is not a partnership.

In the alternative, the plaintiff contends that the organization involved here is a general or ordinary trust. Section 301.7701-4 of the Regulations defines a trust of this kind as being an arrangement whereby a trustee takes title to property and protects and preserves it for beneficiaries who cannot share in the discharge of this responsibility and, by reason thereof, are not associates in a joint enterprise for the conduct of business for profit. Clearly, the Trust in this case could not meet these requirements, because it did more than merely hold and protect the title to property for the investors—it conducted an active business for profit.

If the orgainization in this case was any kind of trust, it was a business or commercial trust created by the investors to carry on a profit-making business. The fact that it was technically cast in trust form did not change the real character of the organization if under the Regulations discussed herein it more nearly resembled an association or a partnership than a trust. See Section 301.7701-4(b) of the Regulations which defines business trusts. Even though the organization in the instant case could be said to be a business trust, it is considered for tax purposes as an association that is taxable as a corporation because it has all of the characteristics of a corporation.

 In our opinion, the Treasury Regulations cited in this opinion are reasonable and conform to the revenue statutes, and are, therefore, valid. *See* United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 505, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Birchenough v. United States, 410 F.2d 1247, 187 Ct.Cl. 702 (1969); Hampton Roads Ind. Electronics Corp. v. United States, 178 F.Supp. 474, 147 Ct.Cl. 635 (1959).

We conclude that the Cherry Hill Trust more nearly resembles an association than a general trust or a partnership and consequently, was taxable as a corporation. Accordingly, we hold that plaintiff is not entitled to a refund of taxes for the calendar years 1965, 1966, and 1967, and interest thereon.

### CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein the necessary facts that were stipulated by the parties, the court concludes as a matter of law that judgment should be and is hereby entered in favor of the defendant; that plaintiff's claim is denied; and plaintiff's petition is dismissed.