George ZUCKMAN and Ethel Zuckman

v.

The UNITED STATES.

No. 798–71.

United States Court of Claims.

Oct. 22, 1975.

Bart A. Brown, Jr., Cincinnati, Ohio, atty. of record, for plaintiffs. David S. Mann and Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, of counsel.

John E. Evans, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Robert H. McKnight, Jr., and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and SKELTON, Judge.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This case concerns the proper classification for tax purposes of a limited partnership with a sole corporate general partner pursuant to Treasury Regulations Section 301.7701–2.[1] Plaintiff, George Zuckman, joined by his wife, Ethel Zuckman,[2] seeks a refund of $6,299.56 plus interest for Federal income taxes paid for the calendar year 1968.

During 1968, plaintiff held an interest, as limited partner, in a Missouri real estate development group known as Towne House. The principal issue presented by the parties' respective motions for summary judgment is whether Towne House should be classified as an association or a partnership. If classified as an association, which is taxable as a corporation under Section 7701(a)(3) of the Internal Revenue Code of 1954,[3] then only the association itself may take deductions for any net operating losses sustained during its 1968 taxable year. Section 11(a). If classified as a partnership within the meaning of Section 7701(a)(2) of the Code, then plaintiff may deduct his pro rata share of such losses under Section 701, which permits the pass-through of partnership income and losses to the individual partners. Since we find that Towne House, under the standards set forth in Treasury Regulations Section 301.7701–2, "more nearly resemble[d]" a partnership than a corporation during the period in question, we conclude that plaintiff was entitled to deduct his distributive share of the Towne House losses. Accordingly, we grant plaintiff's motion for summary judgment, and deny defendant's cross motion.

The parties are generally in agreement as to the material facts. The stated purpose of Towne House, formed as a limited partnership under Missouri law by an agreement dated June 10, 1964, was to acquire a specific parcel of real property in St. Louis, Missouri, known as the Lindell property, and to construct and operate an apartment building on that prop-

1. All references hereinafter to regulations are to Treasury Regulations.

2. Ethel Zuckman is a party to this action solely as a consequence of her having filed a joint income tax return with her husband. The term "plaintiff" hereinafter refers only to George Zuckman.

3. All statutory section references are to the Internal Revenue Code of 1954 unless otherwise noted. All such references in the opinion refer to applicable provisions in force in 1968.

erty. The original partners of Towne House and their respective interests before and after completion of construction were as follows:

| Partner | Interest Before Construction (percent) | Interest After Construction (percent) |
|---|---|---|
| Forest Park of Missouri, Inc. | 51 | 69.577 |
| J. H. Kanter | 47 | 29.331 |
| Robert Blatt | 1 | .546 |
| Plaintiff George Zuckman | 1 | .546 |

The limited partnership agreement designated Forest Park as the sole general partner, and J. H. Kanter, Mr. Blatt, and the plaintiff as limited partners.

Forest Park, incorporated under Missouri law on July 17, 1963, was the wholly-owned subsidiary of Kanter Corporation, which in turn was wholly owned by J. H. Kanter. During the period in question, Kanter Corporation had net assets in excess of $3,500,000. From the time of Towne House's formation on June 10, 1964, through the taxable year ending March 31, 1968, Forest Park remained capitalized at only $500, had no substantial assets other than its interest in Towne House, and engaged in no activities beyond those directly related to Towne House. On August 7, 1963, J. H. Kanter, as president and sole shareholder of Kanter Corporation, received from the directors of that corporation a continuing proxy to vote all of the stock of Forest Park "as though he owned the stock in his individual capacity." By use of this proxy, J. H. Kanter elected all of the Forest Park directors during the period in suit. Three of Forest Park's five officers and directors served concurrently as officers and full-time employees of Kanter Corporation. None of these latter officers received any compensation from Forest Park during the fiscal year 1968.

In October 1963, Forest Park acquired the Lindell property from Millstone Construction, Inc., for $574,500, payable pursuant to a promissory note executed jointly by Forest Park and Kanter Corporation. Shortly thereafter, Kanter Corporation pledged all of its Forest Park stock to Millstone Construction as security for the promissory note. A principal payment of $424,500 was made on the note in July 1967, and a new note for $150,000 was executed by Forest Park and Kanter Corporation.

Construction of the apartment building was financed by a loan of $7,873,300 from the Central Trust Company to Towne House. The loan was evidenced by a Deed of Trust Note dated June 24, 1964, secured by the deed of trust executed that same date by Towne House, and insured by the Federal Housing Administration pursuant to Towne House's execution of an FHA Regulatory Agreement. This latter agreement, in part, prohibited voluntary dissolution of Towne House absent FHA approval, so long as the Towne House property remained subject to the FHA insured mortgage.[4] The agreement further provided that none of the partners of Towne House would be personally liable for repayment of the FHA loan. Towne House defaulted on its mortgage payments in 1967 and, on September 27, 1967, an agreement restoring the mortgage to current status was executed among Towne House, the FHA, and Kanter Corporation, whereunder Kanter Corporation assumed a potential liability to the FHA of $78,333.

4. The FHA prohibition was incorporated into the Towne House Limited Partnership Agreement by amendment dated June 24, 1964.

Plaintiff and Mr. Blatt were the largest shareholders and highest officers of Towne Construction, Inc., which was incorporated in Missouri on June 4, 1964, to serve as general contractor for the Towne House construction project. In the contract between Towne Construction and Towne House, dated June 22, 1964, Towne House reserved the right to approve all subcontracts. Beginning in June 1964, Kanter Corporation rendered services to Towne Construction for which it was paid $53,000.

Additional limited partners were added at various times during 1967 and 1968. These new partners were all subcontractors on the Towne House construction project. Thereafter, the partners and their respective interests for the taxable year ending March 31, 1968, were as follows:

| Partner | Interest (percent) |
| --- | --- |
| Forest Park | 61.829 |
| J. H. Kanter | 21.798 |
| Robert Blatt | 1.014 |
| Plaintiff | 1.014 |
| Burroughs Glass Co. | .355 |
| Metal Trims, Inc. | .811 |
| Ray R. Dolan, Sr. | .253 |
| Daniel F. Shedran | .253 |
| Milton J. Ortbal | .169 |
| Stephen Gorman Bricklaying Co., Inc. | 6.759 |
| Thomas J. Dolan | 1.690 |
| Daniel E. Siegel | 4.055 |
| | 100.000 |

For its fiscal year ending March 31, 1968, Towne House had a net operating loss of $1,050,759. In computing this loss, Towne House took deductions for depreciation in the amount of $533,302 and for interest in the amount of $426,333. As of March 31, 1968, plaintiff had contributed a total of $7,500 to Towne House as a limited partner. Plaintiff's distributive share of Towne House's loss for the fiscal year ending March 31, 1968, was $10,655. This loss was claimed by plaintiff on his Federal income tax return for calendar year 1968. By letter dated January 12, 1970, the District Director of Internal Revenue, Cincinnati, Ohio, issued a proposed assessment, disallowing plaintiff's claimed deductions for the stated reason that Towne House, during the applicable period, was to be considered an association, and not a partnership, for tax purposes. On November 30, 1970, plaintiff paid the full amount of the proposed assessment, plus statutory interest, and on December 14, 1970, filed a timely claim for refund. After more than six months had elapsed without action on the claim, plaintiff instituted this suit.

I

*The Classification Regulations*

The Internal Revenue Code defines a partnership to include "a syndicate, group, pool, joint venture, or other unincorporated organization * * * which is not, within the meaning of this title a trust or estate or a corporation." Section 7701(a)(2). A corporation is defined to include "associations, joint-stock companies, and insurance companies." Section 7701(a)(3). To clarify and effectuate these rather broadly drawn definitions, the Internal Revenue Service promulgated a series of regulations embodying standards for each of the three major classes of business organizations—associations (taxable as corporations), partnerships and trusts. Reg. §§ 301.7701–2

(1960) (associations), –3 (partnerships), and –4 (trusts).

The regulation applicable to partnerships states that an organization qualifying as a limited partnership under state law may be classified for tax purposes as an association if, after the standards in the regulation dealing with associations are considered, the limited partnership more closely resembles a corporation than a partnership. Reg. § 301.7701–3(b). The regulation dealing with associations articulates six corporate characteristics: (1) associates, (2) an objective to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) liability for corporate debts limited to corporate property, and (6) free transferability of interests. Reg. § 301.7701–2(a)(1). Since (1) associates and (2) an objective to carry on a business and divide the gain are characteristics common to both partnerships and corporations, they are generally disregarded in distinguishing between the two. Reg. § 301.7701–2(a)(2). Thus, the classification of a limited partnership with a corporate general partner as either a partnership or a corporation for income tax purposes must turn on the remaining four characteristics.

The regulations in their present form are the product of a long and turbulent evolution in the application of the income tax laws to various types of organizations.[5] The corporate characteristics applied for purposes of tax classification were first enumerated by the Supreme Court in the 1935 landmark case of *Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). *Morrissey*

involved a trust created for the development of a golf course and the sale and rental of attached real estate. The trustees were accorded broad management and control rights, liability was limited to the trust property, beneficial interests were freely transferable and the death of a trustee did not terminate the trust. In holding the trust taxable as an association, the Court set out the six characteristics of a corporation, stating that if an organization more closely resembled a corporation than another type of business organization, then it should be classified as one and taxed accordingly. 296 U.S. at 360, 56 S.Ct. 289.

Expanding the scope of this principle beyond the area of trusts, the Court noted: "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to [the] features distinguishing associations from partnerships as well as from ordinary trusts." 296 U.S. at 357, 56 S.Ct. at 295. This rule became known as the "resemblance test," and regulations embodying the test were promulgated under the Internal Revenue Code of 1939.[6]

A second stage in the development of the classification regulations occurred during the two decades following the *Morrissey* decision, as increased personal tax rates encouraged many professional groups to create associations and file corporate tax returns. The Internal Revenue Service opposed this movement and in 1954, another landmark case, *United States v. Kintner*, 216 F.2d 418 (9th Cir. 1954), was decided. In *Kintner*, the Ninth Circuit affirmed the trial court's finding that a group of doctors

---

**5.** Review of this evolution, particularly as it reflects the continuing conflict between the Internal Revenue Service on the one hand, and professional groups seeking association status and real estate syndicates seeking partnership status on the other, suggests why the current regulations appear so heavily weighted in favor of partnership classification. *See* Rustigan, *Effect of Regulation Definitions on Real Estate Syndicates*, N.Y.U. 19th Inst. on Fed. Tax. 1065 (1961). *See also* Comment. *Tax Classification of the Limited Partnership with a Sole Corporate General Partner under the*

*Regulations and Revenue Procedure 72–13*, 20 Wayne L.Rev. 135 (1973); Stein, *Partnership Taxation for the Limited Partnership with a Corporate General Partner—It Can Be Done*, 25 U.Miami L.Rev. 435 (1971); Allison, *The Limited Partnership with a Corporate General Partner—Federal Taxation—Partnership or Association?* 24 Sw.L.J. 285 (1970).

**6.** Reg. 103, § 19.3797–1 to –7 (1939); Reg. 111, § 29.3797–1 to –7 (1943); Reg. 118, § 39.-3797–1 to –7 (1953).

who were operating a clinic under "articles of association" should be taxed as a corporation under the *Morrissey* standards.

Subsequently, in order to make it more difficult for an unincorporated association to meet the standards of corporate resemblance, the Service issued new regulations. These "Kintner Regulations" were issued under the Internal Revenue Code of 1954 and appeared in 1960. Reg. § 301.7701–1 to –11, T.D. 6503, 1960–2 Cum.Bull. 412. In addition to specifically directing the courts to look to state law in order to determine whether or not a particular corporate characteristic existed, Reg. § 301.7701–1(c), a regulation required that "more corporate characteristics than noncorporate characteristics" be present before an organization could be classified as an association. Reg. § 301.7701–2(a)(3).[7] The regulations set forth each of the four distinguishing corporate characteristics in detail.

## II

### Continuity of Life

The first of the four corporate characteristics, continuity of life, is defined by the regulation to exist when "the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution" of the organization. Reg. § 301.7701–2(b)(1). As a shorthand route to this determination, the final sentence of the regulation— added as part of the 1960 amendments— provides, in blanket fashion, that "a general partnership subject to a statute corresponding to the Uniform Partnership Act and a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act both lack conti-

nuity of life." Reg. § 301.7701–2(b)(3). The State of Missouri has adopted without material change both the Uniform Partnership Act (hereinafter referred to as the "UPA") and the Uniform Limited Partnership Act (hereinafter referred to as the "ULPA"). *See City of North Kansas City, Missouri v. Sharp*, 414 F.2d 359, 366 (8th Cir. 1969); 6 U.L.A. 65 (Supp.1975). In addition, there is no dispute that Towne House was formed as a limited partnership pursuant to the Missouri statute. Accordingly, were the regulation to be literally applied, a finding that Towne House lacked the corporate characteristic of continuity of life would be inescapable.

■ Defendant argues, however, that two factors in this case present a unique circumstance not provided for by either the regulation or the ULPA: (1) the existence of a sole corporate general partner, and (2) an amendment to the limited partnership agreement, executed pursuant to a separate FHA underwriting agreement, expressly prohibiting the partnership's voluntary dissolution. By virtue of these two factors, defendant contends, literal application of the regulation's shorthand test would be inappropriate, inasmuch as the remainder of the regulation dictates inquiry into the substance, not merely the form, of a particular entity. We disagree with defendant and hold, in express accordance with the regulation, that a limited partnership subject to a ULPA-type statute cannot have the corporate characteristic of continuity of life.

Even had the last sentence of the regulation been omitted, however, the same result would necessarily follow under the detailed standards set forth in the remainder of the regulation.[8] The regulation provides that:

7. This numerical test is discussed in Part VI of this opinion. For present purposes, it is sufficient to note, as a general rule, that if an organization is found to lack two or more of the four "major" corporate characteristics, it will be classified for tax purposes as a partnership rather than as an association.

8. Since identical results are reached both under the regulations' standards and under what

we have termed its "shorthand" test, which incorporates applicable provisions of the ULPA, it is reasonable to infer that the detailed standards will generally be unnecessary when dealing with an entity formed under a ULPA-type statute. When the current regulations first appeared, in 1939, without the final sentence, only 20 jurisdictions had then adopted the ULPA. *See* 6 U.L.A. 65 (Supp.1975).

If the retirement, death, or insanity of a general partner of a limited partnership causes a dissolution of the partnership, unless the remaining general partners agree to continue the partnership or unless all remaining members agree to continue the partnership, continuity of life does not exist.

Reg. § 301.7701–2(b)(1). The regulation further states that, even if the partnership agreement provides for continuation of the business by the remaining partners in the event of a member's death or withdrawal, such agreement will not establish continuity of life "if, under local law, the death or withdrawal of any member causes a dissolution of the organization." Reg. § 301.7701–2(b)(2).

Looking first to local law, Section 20 of the ULPA (Mo.Ann.Stat. § 359.200) articulates the causes of dissolution as follows:

> The retirement, death or insanity of a general partner dissolves the partnership, unless the business is continued by the remaining general partners
>
> > (1) Under a right so to do stated in the certificate; or
> >
> > (2) With the consent of all members.

Under its Limited Partnership Agreement of June 10, 1964, Towne House was to continue in existence until the year 2010 unless sooner terminated in accordance with the agreement's other terms. Paragraphs (14) and (15) of the Agreement provide for such earlier termination under the following circumstances:

> (b) *Managing Partner.* In the event of the adjudication of bankruptcy or the forfeiture of the corporate charter of the Managing Partner, the Partnership shall be dissolved.
>
> 15. *Causes of Dissolution of Partnership.* The Partnership shall be dissolved upon the happening of any of the following events:
>
> > (a) The adjudication of bankruptcy, or the forfeiture of the Charter of the Managing Partner.

> (b) The decision of Partners owning a majority of the participation units then owned by all Partners to dissolve the Partnership.

Thus, even were we to find that Forest Park, the sole corporate general partner, were subject to the complete control of J. H. Kanter, making its voluntary withdrawal unlikely, it could still become bankrupt and, in such event, Towne House's dissolution would automatically result. *See* 11 U.S.C. § 23 (when all general partners are adjudged bankrupt, so is the partnership).

Nor, for several reasons, could dissolution be avoided by means of a right to continue the business. First, such right is unequivocally eliminated by paragraph (13) of the Towne House Certificate of Limited Partnership, which states that:

> Under the partnership agreement no right is given to the general partner or the limited partners to continue the business on the retirement, or disability or forfeiture of charter of the general partner.

Second, since the withdrawal of Forest Park would leave no remaining general partners exclusively entitled under the ULPA to continue the business, there could be no continuation in any event. Finally, under the rule announced in *Glensder Textile Co. v. Commissioner*, 46 B.T.A. 176, 185–86 (1942), expressly adopted by the Treasury in its final regulations, Reg. § 301.7701–2(b)(1), the mere reservation in the limited partnership agreement of a power in the remaining general partners to continue the business on a general partner's withdrawal, constitutes only a "contingent continuity of existence," insufficient to satisfy the regulation's corporate standard.

██ Notwithstanding the above, defendant argues that the amendment to the Towne House Limited Partnership Agreement (hereinafter referred to as the "FHA amendment"), in consideration

---

By 1960, however, when the final sentence appeared, only 12 jurisdictions had not yet adopted the Act and, hence, this greater uniformity among state partnership laws permitted use of an abbreviated test.

for which the FHA undertook to insure a non-recourse loan to Towne House of nearly $8,000,000, is controlling here. The amendment provides, in pertinent part, that:

> * * * 2. There is added to section 15b the following provision. There shall be no voluntary dissolution of the partnership so long as the property of the partnership is subject to an FHA insured mortgage without the express prior written approval of the Commissioner of the Federal Housing Administration.

Defendant also cites the Regulatory Agreement itself, which states that:

> Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors; or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within 45 days.

Defendant contends that the effect of these agreements was to deprive the owners of Towne House of their right lawfully to dissolve the partnership and, hence, that Towne House thereby contractually assumed the corporate characteristic of continuous existence.

We agree with defendant that by the FHA amendment, Forest Park relinquished its right voluntarily to withdraw from Towne House, or otherwise to act, or fail to act, in such a way as to cause dissolution of the partnership under Missouri law. In this respect, the FHA amendment was little different in effect from a provision in a partnership agreement that the firm is to be continued for a definite term, or until accomplishment of a particular undertaking. Under such circumstances, it has long been held in Missouri, as elsewhere, that no partner has the right to dissolve the partnership until the term has ended or the under-

taking been accomplished. *See, e. g., Zimmerman v. Harding,* 227 U.S. 489, 33 S.Ct. 387, 57 L.Ed. 608 (1913); *Pemberton v. Ladue Realty and Construction Co.,* 237 Mo.App. 971, 180 S.W.2d 766 (1944); *Fuller v. Laws,* 219 Mo.App. 342, 271 S.W. 836 (1925); *Seufert v. Gille,* 230 Mo. 453, 131 S.W. 102 (1910).

It does not follow, however, as defendant further contends, that because Forest Park surrendered its *right* to voluntarily dissolve the Towne House partnership, it also and simultaneously surrendered its *power* to do so. The Treasury Regulation, the Uniform Acts and the weight of relevant decisions are to the contrary. They consistently distinguish between a partner's right and his power to dissolve the partnership entity, notwithstanding the existence of an agreed term or transaction to be completed. As the regulation states:

> In determining whether any member has the *power* of dissolution, it will be necessary to examine the agreement and to ascertain the effect of such agreement under local law * * * [I]f the agreement provides that the organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement is that no member has the *power* to dissolve the organization in contravention of the agreement. Nevertheless, if, notwithstanding such agreement, any member has the *power* under local law to dissolve the organization, the organization lacks continuity of life.

Reg. § 301.7701–2(b)(3) [Emphasis added].

The significance of this distinction was well expressed in the early case of *Karrick v. Hannaman,* 168 U.S. 328, 334–37, 18 S.Ct. 135, 138, 42 L.Ed. 484 (1897), where the Supreme Court, addressing the question of whether one partner, without the assent of the other, has the power to dissolve a partnership for a specified term before the expiration thereof, stated as follows:

A contract of partnership is * * * in effect, a contract of mutual agency, each partner acting as a principal in his own behalf and as agent for his co-partner. [Citation omitted.] No partnership can efficiently or beneficially carry on its business without the mutual confidence and co-operation of all the partners. Even when, by the partnership articles, they have covenanted with each other that the partnership shall continue for a certain period, the partnership may be dissolved at any time, at the will of any partner, so far as to put an end to the partnership relation and to the authority of each partner to act for all but rendering the partner who breaks his covenant liable to an action at law for damages, as in other cases of breaches of contract. [Citations omitted.] [T]he only difference, so far as concerns the right of dissolution by one partner, between a partnership for an indefinite period and one for a specified term, is this: In the former case, the dissolution is no breach of the partnership agreement, and affords the other partner no ground of complaint. In the latter case, such a dissolution before the expiration of the time stipulated is a breach of the agreement, and as such to be compensated in damages; but in either case the action of one partner does actually dissolve the partnership.

*See also* Restatement, Second, *Agency* § 118.

This recognition in *Karrick* of a partner's power to dissolve, although the right to dissolve does not exist, has been followed by a majority of American jurisdiction, *see* Crane & Bromberg on Partnership § 75, at 427–28 (1968), and has been incorporated in the Uniform Partnership Act,[9] Sections 31(2) and 38(2)(a)(II).

In sum, whether Forest Park had the right, voluntarily or involuntarily, to cause dissolution of the partnership, *i. e.*, could do so without breaching the partnership agreement and incurring liability therefore, is immaterial.[10] Since Forest Park had the power under Missouri law to dissolve the partnership, irrespective of the consequences, we conclude that— even absent the final unequivocal sentence of the regulation, Reg. § 301.7701–2(b)(3)—Towne House lacked the corporate characteristic of continuity of life.

### III

### *Centralization of Management*

The second corporate characteristic, centralization of management, is defined by the regulation as "a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization." Reg. § 301.7701–2(c)(3). As with continuity of life, the final sentences of the regulation, added in 1960, ostensibly furnish a shorthand test for application to limited partnerships "subject to a statute corresponding to the Uniform Limited Partnership Act." Reg. § 301.7701–2(c)(4). Such partnerships, the regulation states, "*generally* do not have centralized management, but centralized management *ordinarily*

---

**9.** Section 6(2) of the Uniform Partnership Act makes the UPA applicable to limited partnerships except insofar as it is inconsistent with the Uniform Limited Partnership Act.

**10.** It may be noted, however, that although the consequences of wrongful or premature termination are disregarded for purposes of the Treasury Regulations, both the UPA and ULPA contain ample provisions for the protection of the partnership's remaining partners, creditors and adverse claimants. Thus, we see no merit in defendant's tacit suggestion that Forest Park's withdrawal and dissolution of Towne House would leave the FHA and other

creditors and obligees without recourse on their claims. Under the Uniform Act, as adopted in Missouri, "on dissolution the partnership is not terminated but continues until the winding up of partnership affairs is completed." UPA § 30 (Mo.Ann.Stat. § 358.300). Further, the dissolution of a partnership, whether limited or general, does not abrogate existing contracts to which it is a party. *See City of North Kansas City, Missouri v. Sharp*, 414 F.2d 359, 366 (8th Cir. 1969) (applying Missouri law); *Prater v. Rush*, 228 Mo.App. 922, 74 S.W.2d 875 (1934); *Armstrong v. Henley*, 182 Mo.App. 320, 170 S.W. 402 (1914).

does exist in such a limited partnership if substantially all the interests in the partnership are owned by the limited partners." *Id.* [Emphasis added].

As the words "generally" and "ordinarily" imply, limited partnership status does not in itself preclude centralized management, as it does continuity of life. Unlike a general partnership, wherein the mutual agency relationship between partners empowers each partner to act on behalf of the entity and to bind all partners by his acts, notwithstanding any agreement vesting management in a selected few, limited partners typically lack virtually all management control rights. Thus, insofar as "continuing exclusive authority to make independent business decisions" is concentrated in the hands of the general partners, a limited partnership may be said always to possess centralized management.

This was essentially the position adopted by the Treasury in its proposed regulations, issued in December 1959. 24 Fed.Reg. 10450. In response to these, substantial objections were raised on the ground that the regulation had long observed a distinction between centralized management in the corporate sense and the limited partnership sense, respectively.[11] In the corporate context, there could be no centralized management unless the management power is held and exercised in a representative capacity, *i. e.*, by directors, acting as representatives of the stockholders. In the limited partnership context, however, centralized management meant that the general partner has the exclusive management power, ULPA § 9, and acts primarily in his own behalf, subject only to the fiduciary duty he owes to the other partners. UPA §§ 18–23. Association status for tax purposes under the regulations turns upon an organization's resemblance to a corporation. Reg. § 301.7701–2(a)(1). The focus of inquiry must therefore be on the "representative," rather than the "centralized," character of management, inasmuch as centralization *per se* is generally common to both corporations and limited partnerships and, hence, immaterial in distinguishing between the two. Reg. § 301.7701–2(a)(2).

The characteristic of centralized management held in a representative capacity was recognized as a corporate trait in the *Morrissey* decision from which the present regulations derive, 296 U.S. at 359, 56 S.Ct. 289, and was incorporated into the definitional sentence of the regulation, which states: "Centralized management means a concentration of continuing exclusive authority to make independent business decisions *on behalf* of the organization * * *." Reg. § 301.7701–2(c)(3) [Emphasis added]. The final regulation, promulgated in 1960, bears out this continuing focus on the representative character of an organization by providing that centralized management will ordinarily obtain in a limited partnership "if substantially all the interests in the partnership are owned by the limited partners." Reg. § 301.7701–2(c)(4). The rationale for this ownership test, as suggested by the foregoing analysis, is that if the limited partners own substantially all the partnership's interests, then the general partner can only be acting on their behalf, *i. e.*, in a representative capacity, and, hence, the partnership must possess the corporate management characteristic.

In applying this test, defendant contends that, since J. H. Kanter indirectly owned and controlled Forest Park, "it is entirely appropriate for present purposes to consider Forest Park's ownership interest in Towne House as in substance owned by J. H. Kanter." *Defendant's Brief*, at p. 85. By means of such attribution, defendant's argument runs, J. H. Kanter should be considered the owner of 98 percent of the interests in Towne House (Forest Park's 51 percent plus J. H. Kanter's 47 percent) up to the time of the admission of additional limited partners (*i. e.*, to at least December 15, 1967), and the owner of 83 percent thereafter.

---

11. *See* Rustigan, *Effect of Regulation Definitions on Real Estate Syndicates*, N.Y.U. 19th Inst. on Fed.Tax 1065, 1071 (1965).

Accordingly, Towne House must possess the corporate characteristic of centralized management since, under the regulation, "substantially all the interests in the partnership are held by the limited partners" (*i. e.,* J. H. Kanter). This argument is adroit but unacceptable.

■ First, we can find no authority, nor has any been cited by defendant, for applying a constructive ownership rule to the determination of the locus of substantial ownership and control in a limited partnership. Certainly no such rule can expressly be found among the pertinent statutes and regulations. Experience likewise suggests that where such a rule has been considered appropriate, defendant has proven adept at making such appropriateness known other than by resort to mere inference and analogy. *See, e. g.,* Int.Rev.Code §§ 267, 318, 544 and 554. In arguing for the applicability of a constructive ownership rule, defendant is in effect challenging its own regulation. It is well settled, however, that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); *see United States v. Correll,* 389 U.S. 299, 305–06, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); *Birchenough v. United States,* 410 F.2d 1247, 1252, 187 Ct.Cl. 702, 710 (1969); *Weyerhaeuser Co. v. United States,* 395 F.2d 1005, 1008, 184 Ct.Cl. 492, 497 (1968).

In a recent case, moreover, we expressly held that the instant regulations "are reasonable and conform to the revenue statutes, and are, therefore, valid." *Outlaw v. United States,* 494 F.2d 1376, 1386, 204 Ct.Cl. 152, 169 (1974), *cert. denied,* 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974). Under these circumstances, the regulations must be considered as binding on the Government as they are on the taxpayer. *See Weyerhaeuser Co. v. United States, supra;*

*McCord v. Granger,* 201 F.2d 103, 106 (3d Cir. 1952). The express language of the regulation neither directly nor otherwise contemplates application of a constructive ownership rule. Absent such a rule, Forest Park's undoubtedly substantial interest in Towne House's capital and profits would ordinarily preclude a finding that the latter possessed centralized management.

Even were Forest Park's interest attributable to J. H. Kanter on some theory, the result—under our reading of the regulation—would be the same. Centralized management, taken in the abstract, is common to both corporations and limited partnerships. The regulation's ownership (or "substantial interest") test applicable to limited partnerships is only a shorthand means of ascertaining, in the ordinary case, whether or not the centralized management power is held and exercised in a representative capacity, *i. e.,* by directors acting on behalf of the stockholders. Where substantially all the interests in an organization are owned by the limited partners, *i. e.,* distributed broadly among a comparatively large number of limited partners *qua* stockholders, then the regulation erects a presumption that the centralized management power (in the hands of the general partner or partners) will generally be exercised on the limited partners' behalf. Were Forest Park's interest attributable to J. H. Kanter, however, as defendant contends, J. H. Kanter's resultant 98 percent (or 83 percent) interest in Towne House would in itself effectively rule out any possibility of representative management.

## IV

### Limited Liability

The regulation states that an organization has the third corporate characteristic, limited liability, if there is no member [12] who is personally liable for the debts of and claims against the organiza-

---

12. Under the regulation, to establish that Towne House lacks the corporate characteristic of limited liability, plaintiff need only show that any of its *members, i. e.,* Forest Park or J. H. Kanter, could be held personally answerable for the partnership's debts.

tion under local law. Reg. § 301.7701–2(d)(1). Personal liability is defined as existing when a creditor or tort victim may seek personal satisfaction from a member of the organization to the extent that the assets of the organization are insufficient to satisfy his claim. *Id.* In this case, these are essentially two members as to whom personal liability may exist for the debts of and claims against Towne House: Forest Park and J. H. Kanter.

Defendant argues that personal liability cannot exist as to Forest Park since, under the regulation, it has no substantial assets (other than its interest in the partnership) which could be reached by a creditor of Towne House, and is merely a "dummy" acting as the agent of the limited partners (*i. e.*, J. H. Kanter). Plaintiff, while conceding that Forest Park had no substantial assets, counters that determination of the corporate partner's "dummy" status involves questions of fact which, if critical to the outcome, would be inappropriate for resolution on this motion for summary judgment.

With respect to J. H. Kanter, the second party as to whom personal liability may exist for Towne House's debts, the parties reach a similar impasse. Both agree, and plaintiff vigorously supports the fact, that "beyond question J. H. Kantner completely ran the Towne House show," *Plaintiff's Reply Brief*, at pp. 13–19; *Defendant's Reply Brief*, at p. 18, and that he "was the single person in charge of all of Towne House's business decisions," *Plaintiff's Brief*, at p. 5; *Defendant's Brief*, at p. 87. Plaintiff argues, however, that these facts alone, insofar as they establish that J. H. Kanter was in "control" of Towne House, are sufficient to make J. H. Kanter personally liable for the partnership's debts. In support of this contention, plaintiff relies on Section 7 of the Uniform Limited Partnership Act (Mo.Ann.Stat. § 359.070) and Missouri decisions construing it. Section 7 states that:

A limited partner shall not become liable as a general partner unless, in ad-

dition to the exercise of his rights and powers as a limited partner, *he takes part in the control of the business.* [Emphasis added]. Plaintiff also relies on the applicable portion of the regulation, which provides that:

Notwithstanding the formation of the organization as a limited partnership, when the limited partners act as the principals of such general partner, personal liability will exist with respect to such limited partners.

Reg. § 301.7701–2(d)(2).

Defendant, relying on the same statute and regulation and generally identical decisions, counters that J. H. Kanter's control of the business, although conceded, is not in itself sufficient to make him a general partner in fact, or otherwise to render him personally liable for Towne House's obligations. For personal liability to exist, according to defendant, plaintiff must show not only that J. H. Kanter was in control of Towne House but, in addition, that his words or actions have actually and reasonably led third parties to believe that he was generally liable, and to act on that belief. *Defendant's Brief*, at p. 87; *Defendant's Reply Brief*, at pp. 20–21. Such requisite third party reliance, defendant contends, simply cannot be shown in this case, inasmuch as "J. H. Kanter at all times was held out as only a limited partner." *Brief*, at p. 87.

Clearly if, as plaintiff contends, the fact of "control" alone constitutes a sufficient basis in law for holding J. H. Kanter personally liable, then we must conclude that Towne House lacks the corporate characteristic of limited liability. If, however, as defendant argues, third party reliance constitutes a necessary and material factor in the limited liability equation, we are presented, as in the case of Forest Park's disputed "dummy" and agency status, with a genuine issue of material fact inappropriate for resolution on these cross motions for summary judgment.

However, we have concluded that it is unnecessary to remand either of these

factual issues for trial in order to determine that Towne House lacks the corporate characteristic of limited liability, inasmuch as the *regulation* itself, albeit none too lucidly, mandates such a finding as a matter of law.

The portion of the regulation dealing with limited liability, added *in toto* as part of the 1960 amendments, incorporates by reference applicable provisions of the ULPA as a shorthand test similar to those tests, earlier discussed, bearing upon centralized management and continuity of life. As the history of the 1960 amendments suggests, the intent of the drafters was to make it as difficult as possible for the then-burgeoning medical and legal partnerships to achieve association status for tax purposes. In this aim, particularly with respect to the characteristic of limited liability, the drafters were eminently successful.

Paragraph 2(d), subparagraph (1) of the regulation provides, in pertinent part, that:

> * * * [I]n the case of a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act, personal liability exists with respect to each general partner, except as provided in subparagraph (2) of this paragraph.

After stating the general rule that a limited partnership does not normally possess limited liability, subparagraph (2) merely describes four specialized situations to which this general rule will nonetheless apply, one situation to which it will not, and one in which personal liability will exist with respect to limited partners. Thus, subparagraph (2) states that personal liability will exist with respect to a general partner where (1) such general partner is a corporation having substantial assets which can be reached by creditors; (2) the general partner contributes only services, but still has substantial assets; (3) the general partner has substantial assets, although insufficient to satisfy the obligations of an organization engaged in large-scale financial transactions; and (4) the general partner has no substantial assets and is not merely a "dummy" acting as the agent of the limited partners. Since Forest Park, the sole general partner of Towne House, concededly has no substantial assets, we are concerned here only with (4). Thus, if Forest Park is *not* a "dummy," it is personally liable.

In only one situation does the regulation provide an exception to the general rule of personal liability with respect to the general partners of a limited partnership. If the general partner has no substantial assets (as here), and *is* merely a "dummy" acting as the agent of the limited partners, it is not personally liable. However, in that situation, the following provision of subparagraph (2), previously quoted above, becomes pertinent: "Notwithstanding the formation of the organization as a limited partnership, when the limited partners act as the principals of such general partner, personal liability will exist with respect to such limited partners." Thus, although the general partner is not personally liable when it is a "dummy" and acts merely as an agent, the limited partners as principals of the general partner are personally liable. In short, the regulation draws a tight, albeit opaque, circle by declaring that where the general partner of a limited partnership has no assets, only two alternatives may follow: (1) if it is not a "dummy", then it is personally liable; or (2) if it *is* a "dummy", then the limited partners for whom it acts as agent and who in turn serve as its principal, are personally liable. In either case, the limited partnership cannot have limited liability, inasmuch as at least one of its "members" —whether general or limited—must at all times bear personal liability.[13]

In view of the foregoing, it is unnecessary to proceed further to determine

**13.** *See* 1 Rabkin & Johnson, *Federal Income, Gift & Estate Taxation* § 2.11 (1970 Supp.); Comment, *Tax Classification of the Limited Partnership with a Sole Corporate General Partner Under the Regulations and Revenue Procedure 72–13,* 20 Wayne L.Rev. 135, 149 (1973).

whether third party reliance existed in this case. Such determination would have bearing only upon the question of which party, Forest Park or J. H. Kanter, must ultimately bear personal responsibility for Towne House's obligations. For tax classification purposes, it is sufficient to conclude that either one or the other would have to bear such responsibility. Accordingly, we hold that, under the applicable regulation, Towne House lacks the corporation characteristic of limited liability.

## V

### Free Transferability of Interests

The fourth and last major corporate characteristic, free transferability of interests, is defined by the regulation to exist with respect to an organization when "[e]ach of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization * * [and] to confer upon [their] * * * substitute all the attributes of [their] * * * interest in the organization." Reg. § 301.7701–2(e)(1). *See also* Reg. § 301.7701–3(b)(2), example (1) (limited partner who may transfer his entire interest only with unanimous consent of general partners will not have a freely transferable interest).

Also added as part of the 1960 amendments, this portion of the regulation is perhaps the simplest and most straightforward in operation and, accordingly, its application presents little difficulty. While the term "substantially all" is not defined in the regulation, we may fairly and reasonably conclude that the 61 per-

cent (and, after the admission of new limited partners, 49 percent) interest held by Forest Park, taken alone, would be insufficient.[14] Accordingly, in order for Towne House to possess the corporate characteristic of free transferability, it is necessary to show that not only Forest Park's interest, but J. H. Kanter's interest as well, was freely transferable.

In determining, first, whether J. H. Kanter had the power, without the consent of other members of Towne House, to substitute for himself a non-member of the organization, we must look to the pertinent provisions of the ULPA as adopted in Missouri. Section 19, subsection (4) thereunder (Mo.Ann.Stat. § 359.-190(4)) provides that an assignee shall have the right to become a substituted limited partner if (i) all the members consent thereto, or (ii) the limited partnership certificate empowers the assignor to transfer all his interest to a substituted limited partner. Paragraph (10) of the Towne House Limited Partnership Certificate provides that:

A limited partner has the right under the Partnership Agreement to substitute an assignee as contributor in his place *with the prior consent of the general partner* and upon execution by the assignee of the Partnership Agreement.

[Emphasis added]. Similarly, the Towne House Limited Partnership Agreement provides that "[N]o * * * transferee of the interest of a Limited Partner shall become a substituted limited partner without first obtaining the written consent of Managing Partner, and executing a copy of the Partnership Agreement."

Plaintiff contends that since under the statute and partnership certificate, J. H. Kanter's interest could be fully assigned only with the consent of Forest Park, J.

14. Plaintiff points out that the term "substantially all," as used elsewhere in the Internal Revenue Code, has been defined to mean "all except a negligible minority interest." *Burnet v. Bank of Italy*, 46 F.2d 629, 630 (9th Cir. 1931), *cert. denied*, 283 U.S. 846, 51 S.Ct. 493, 75 L.Ed. 1455 (1931). In addition, the Internal Revenue Service has for certain ruling purposes used a 90% figure as the benchmark for

determining what constitutes "substantially all." Rev.Proc. 66–34, 1966–2 Cum.Bull. 1232, 1233. These indicia are persuasive. For our purposes, however, it is sufficient to conclude—without adopting any affirmative quantitative test—that a 61 percent interest would *not* constitute "substantially all" within the meaning of the regulation.

H. Kanter's interest was therefore not freely transferable within the meaning of the regulation.

Defendant counters that, inasmuch as J. H. Kanter indirectly owned Forest Park, and held a continuing proxy from the Kanter Corporation directors to vote all of Forest Park's stock, the requirement of consent by Forest Park to any assignment of J. H. Kanter's partnership interest was a matter of form, not substance; therefore, J. H. Kanter's interest must be considered as freely transferable. We agree with defendant's contention.

While J. H. Kanter's *de facto* control of Forest Park could not in itself constitute corporate centralized management, which as earlier discussed additionally requires that such control be exercised in a representative capacity, the consequence of such control is different with respect to the characteristic of free transferability. So long as a member has the power, *unconditional* as between that member and the remaining members, to fully substitute a non-member for himself in the organization, the existence of a mere formal or nominal condition will not prevent such member's interest from being freely transferable within the meaning of the regulation.

Defendant further maintains, by reason of J. H. Kanter's *de facto* control of Forest Park, that J. H. Kanter also had complete discretion to fully transfer the Towne House interests of Forest Park. Accordingly, defendant argues that, since the combined interests of J. H. Kanter and Forest Park constituted "substantially all" of Towne House's outstanding interests, Towne House must be deemed to have the corporate characteristic of free transferability. We disagree.

In the absence of an agreement to the contrary, a sole general partner of a limited partnership may assign his interest and substitute another for himself without the consent of the limited partners, but such assignment and substitution will result in a technical dissolution of the partnership unless the right to continue the business is specifically accorded the substituted general partner by the limited partnership certificate. ULPA § 9 (Mo.Ann.Stat. § 359.090). Paragraph (13) of the Towne House Certificate provides that:

Under the partnership agreement no right is given the general partner or the limited partners to continue the business on the *retirement* or disability or forfeiture of charter of the general partner. [Emphasis added].

Thus, for a substitute general partner to have the power, without dissolution, to continue the business on the retirement or withdrawal of the original general partner, there must be unanimous ratification by the limited partners. As stated in Section 9 of the ULPA (Mo. Ann.Stat. § 359–090):

A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to

\* \* \* \* \* \*

(7) Continue the business with partnership property on the death, retirement or insanity of a general partner, unless the right to do so is given in the certificate.

Accordingly, since Forest Park's transfer of its Towne House interests and substitution of a new general partner in its place would require either the consent of all the limited partners (*i. e.*, not merely J. H. Kanter), or—absent such consent—would result in technical dissolution of the firm, Forest Park's interests are not freely transferable. As stated in the regulation:

[A]lthough the agreement provides for the transfer of a member's interest, there is no power of substitution and no free transferability of interest if under local law a transfer of a member's interests results in the dissolution

of the old organization and the formation of a new organization.

In sum, although J. H. Kanter's interests were, in effect, freely transferable within the meaning of the regulation, we find that Forest Park's interests were not. Hence, inasmuch as J. H. Kanter's interests alone could not constitute "substantially all" of the outstanding interests in the firm, we find that Towne House lacked the corporate characteristic of free transferability of interests.

## VI

### Additional Characteristics

Relying on the regulation and our recent decision in *Outlaw v. United States*, 494 F.2d 1376, 1385, 204 Ct.Cl. 152, 169 (1974), *cert. denied*, 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974), defendant's final argument is that certain corporate characteristics other than those expressly identified and described in the regulations may be significant in determining whether an entity is a partnership or an association for tax purposes. The additional corporate characteristics as claimed by defendant are: (1) Forest Park had unilateral power to admit additional limited partners, and (2) Forest Park had exclusive discretion to determine when and if any of Towne House's available funds should be distributed to itself and the limited partners. *Brief*, at pp. 76–77: *Reply Brief*, at pp. 30–33. Inasmuch as we have already found that Towne House lacked all four of the "major" corporate characteristics expressly treated in the regulation, it is plainly unnecessary to consider additional ones in this case.

Moreover, it should be emphasized that our discussion herein of each of the four major corporate characteristics is in no way intended to suggest that an absence of all four characteristics must be found in order to hold a partnership taxable as such under the regulation. On the contrary, the regulation unequivocally states that if an organization "has more corporate characteristics than noncorporate characteristics," Reg. § 301.7701–2(a)(3), it will be classified as an association. Since the regulation specifically covers only four "major" corporate characteristics which are not common to both partnerships and corporations, we interpret the foregoing test to mean that, as a general rule, any partnership *lacking two or more* of these characteristics will not be classified as an association. Conversely, any partnership *having three or more* of these characteristics will be classified as an association.

This is not to say that a taxpayer claiming classification as a partnership will be entitled to prevail in every conceivable situation merely by showing that the organization lacks two of the four major corporate characteristics. As the regulation itself states:

> In addition to the major characteristics set forth in this subparagraph, other factors may be found *in some cases* which may be significant in classifying an organization as an association, a partnership, or a trust.
>
> *       *       *       *       *       *
>
> For example, if a limited partnership has centralized management and free transferability of interests but lacks continuity of life and limited liability, *and if the limited partnership has no other characteristics which are significant in determining its classification*, such limited partnership is not classified as an association.

Reg. § 301.7701–2(a)(1), (3) [Emphasis added].

But this is not such a case, nor can a contrary interpretation of this regulation be derived from our recent decision in *Outlaw*. At issue in *Outlaw* was whether a particular trust should be classified as a trust or a corporation for tax purposes. As such, the dispositive questions under the regulation were whether the trust had associates and an objective to carry on business and divide the gains therefrom. The remaining four major corporate characteristics—those addressed in the case presently before us— are treated by the regulation as common to both corporations and trusts and,

hence, immaterial in distinguishing between the two. As the pertinent portion of the regulation states:

> Some of the major characteristics of a corporation are common to trusts and corporations, and others are common to partnerships and corporations. Characteristics common to trusts and corporations are not material in attempting to distinguish between a trust and an association, and characteristics common to partnerships and corporations are not material in attempting to distinguish between an association and a partnership. For example, since centralization of management, continuity of life, free transferability of interests, and limited liability are *generally common* to trusts and corporations, the determination of whether a trust which has such characteristics is to be treated for tax purposes as a trust or as an association depends on whether there are associates and an objective to carry on business and divide the gains therefrom. On the other hand, since associates and an objective to carry on business and divide the gains therefrom are *generally common* to both corporations and partnerships, the determination of whether an organization which has such characteristics is to be treated for tax purposes as a partnership or as an association depends on whether there exists centralization of management, continuity of life, free transferability of interests, and limited liability.

As the term "generally" implies, the regulation clearly contemplates—as under its provision for consideration of "other factors"—that situations may arise where characteristics *generally* common to both corporations and partnerships, or corporations and trusts, may arguably be lacking in a particular case. Plaintiff has not argued, nor would it have been fruitful for him to argue, that the characteristics of associates and an objective to carry on business and divide the gains therefrom, are lacking in the instant case. Precisely because plaintiff in *Outlaw did* so argue, however (*i. e.*, against the regulation's presumption that the four partnership characteristics are generally common to trusts and corporations), it was necessary in that case to consider factors other than those which the regulation deems normally dispositive in distinguishing between corporations and trusts for tax purposes. Such a problem is not presented in this case.

## CONCLUSION

Since we find that Towne House should be classified as a partnership for tax purposes under Reg. § 301.7701–2, we conclude that plaintiff was entitled to deduct his distributive share of the Towne House losses for the calendar year 1968. Accordingly, it is ordered that plaintiff's motion for summary judgment is granted; defendant's cross motion for summary judgment is denied; and judgment is hereby entered in favor of plaintiff for the sum of $6,299.56, plus interest thereon as provided by law.