NORMAN W. PEMBERTON, RESPONDENT, v. LADUE REALTY & CONSTRUCTION COMPANY, A CORPORATION, AND JAMERSON C. McCORMACK, APPELLANTS.—180 S. W. (2d) 766.

St. Louis Court of Appeals. Opinion filed June 6, 1944.

Motion for Rehearing overruled June 23, 1944.

972

*S. Sylvan Agatstein* and *Don O. Russell* for appellants.

*H. J. Mueller* of Counsel.

974

No brief for respondent.

ANDERSON, J.—Plaintiff Norman W. Pemberton instituted this suit, in the circuit court of the County of St. Louis, by filing a petition in two counts against Jamerson C. McCormack and the Ladue Realty & Construction Company. The first count of the petition was based on breach of contract, and the second count was based on *quantum meruit* for services rendered. The trial below resulted in a verdict and judgment against both defendants, for $7033, on the second count of the petition, and for plaintiff on the counterclaim filed by defendant McCormack. For that judgment defendants appealed to this court.

The first count of the petition alleged that in the spring of 1938 plaintiff and defendant McCormack entered into an oral contract respecting the purchase and development of a certain tract of land, twenty-five acres more or less, located in the city of Ladue, and also a tract of two and one-half acres located in University City; that by said contract it was understood and agreed (1) that the defendant McCormack would undertake the financing necessary for the purchase of said real estate, and for its development, subdivision, and sale; (2) that said financing would be acomplished by the formation of a corporation and the sale of the stock therein to said defendant McCormack and certain members of his family; (3) that said corporation would purchase the property, take title in its own name, and take care of all financing in connection with the development, subdivision, and sale of the said property; (4) that plaintiff would devote all of his time and attention exclusively to the promotion and sales work necessary for the laying out and subdividing of the said property, and the sale of lots, tracts, houses, buildings, and improvements therein; and (5) that for such services plaintiff would receive one-half of the proceeds from the sale of the said lots, tracts, houses, buildings, and improvements, after the deduction of all expenses incurred by the said corporation in the purchase, development, and operation of said subdivision.

The first count of the petition further alleged that pursuant to said agreement defendant McCormack organized the Ladue Realty & Construction Company, a Missouri corporation, took a majority of the

stock therein, and became the president and a director thereof; that said corporation purchased the property and took title to same in its name; that plaintiff thereafter devoted his entire time and attention, from the spring of 1938 until July 31, 1940, to the laying out of said subdivision, to the sale of lots, tracts, buildings, and houses therein, and to such other matters as were necessary in the development, operation, and sale of the property as a subdivision; that defendant Ladue Realty & Construction Company by its conduct in accepting plaintiff's services ratified and adopted said contract theretofore made between plaintiff and defendant McCormack; that defendants refused to permit plaintiff to carry out said contract by refusing to transfer title to lots which plaintiff had sold, and also by sending to plaintiff, on August 7, 1940, a letter purporting to terminate said contract, which letter instructed plaintiff to remove himself and his personal effects from said property; that by reason of the breach of said contract by defendants, plaintiff was deprived of one-half of the profits he would have been entitled to receive upon completion of the development of the subdivision and the sale of the lots and houses therein; that he had rendered services to said defendants over a period of two years, wholly without compensation.

The prayer of the first count of the petition asked for "$20,000, the reasonable value of his services, together with his costs."

The second count of the petition was in *quantum meruit*. It alleged that at the special instance and request of the defendants, plaintiff rendered services of great benefit to defendants in developing, laying out, platting, and promoting as a subdivision certain property in St. Louis County owned by said Ladue Realty & Construction Company, in promoting sales, and in selling lots, houses, and buildings located therein. It further alleged that the reasonable value of such services was $20,000, and it prayed judgment for said sum.

The defendants filed identical separate answers to both counts, which answers, after admitting the corporate existence of the Ladue Realty & Construction Company, and the fact that the defendant McCormack was its president and a director thereof, alleged as follows:

"Further answering, this defendant admits that plaintiff performed certain services in connection with the sale of lots in the subdivision in plaintiff's third amended petition described, but states that plantiff had been fully compensated and paid for all of such services by him rendered, except commissions for the sale of lot 12 in block 3 and lot 11 in block 8 of said subdivision, for which services, however, this defendant offered to pay plaintiff and did actually tender to him a sum in excess of the recognized commission that would be due him for such services, which compensation plaintiff has constantly refused to accept."

The said answers also contained a general denial.

A counterclaim, filed by defendant Ladue Realty & Construction Company, alleged that on August 19, 1940, plaintiff instituted a suit in equity against it, joining as defendants, among others, Curt R. Gallenkamp and his wife, Mildred Gallenkamp, and filed a notice of *lis pendens* in the office of the Recorder of Deeds of St. Louis County, so as to cast a cloud on the title of all the real estate mentioned in the petition in said suit, among which was certain real estate it had contracted to convey to said Gallenkamp and wife; that because of said suit and *lis pendens,* defendant was unable to convey a clear title to said property; that plaintiff well knew at the time that he had no claim against said defendants, either in law or in equity, but joined said Gallenkamps as defendants solely for the purpose of preventing defendant from conveying a clear and marketable title, and to destroy the sale of said property and the profits which would have accrued to it by reason thereof; that in fact said sale was destroyed and the profits therefrom lost to plaintiff. The counterclaim asked $1350 actual and $1000 punitive damages.

Plaintiff testified that in the spring of 1938 he studied the property in question and made up his mind that it was a proper location for a medium-class residential development. He talked to McCormack about the matter for the first time in March or April, 1938, when he met him on the street in Clayton. He then told McCormack that he had a deal set up on this property, but due to certain circumstances, the man with whom he was working was unable to raise the money, and it looked as if the deal were dead; that he was looking for a financial interest to go in with him in the development of this piece of property. McCormack replied that he had a little money and was in a position to take an interest in a venture that had merit. He also told plaintiff that he knew nothing of the real estate business, and suggested that they drive out and take a look at the property. Plaintiff then told McCormack something of the deal plaintiff had set up on the property, and stated that if McCormack would furnish the money to put the venture on its feet, that is, to acquire the property and start the development, such as building roads and putting in sewers, that plaintiff would do all the work and share the profits of the venture with him. The matter was discussed as they drove out to look at the property, and perhaps half a dozen times thereafter, over a period of three or four months. During that time plaintiff and defendant, aided by two boys from the university, made a topographical survey of the land as a part of the plan to take over the property. McCormack ran the instrument, and plaintiff and the boys ran the line and drove the stakes. This work consumed the greater part of a month or a month and a half. Meanwhile negotiations were being conducted with the owner, and on June 23, 1938, an earnest money contract for the property was signed by McCormack. This contract acknowledged the receipt of $1000 from McCormack as

earnest money and part purchase money on account of the purchase of the property in question; it recited that the property was that day sold to McCormack for $45,000; it stated the terms of the sale, and provided that the sale was to be closed on or before July 10, 1938, at the office of Norman W. Pemberton; and, it also provided that upon failure of the purchaser to comply with the terms thereof, the above-mentioned earnest money was to be forfeited to Pemberton and the owner of the premises. The contract was signed by the owners of the property, by McCormack, and by plaintiff as agent for the owners. Later this contract was abandoned, and a new one was entered into on September 27, 1938, between the owners and defendant Ladue Realty & Construction Company. The first contract was abandoned because it was discovered that the city of St. Louis had an easement in the land for a water main, which the parties considered reduced the value of the property from $45,000, the figure agreed upon in the first contract, to $40,000, the purchase price set by the second contract. Before the second earnest money contract was executed, at plaintiff's suggestion the Ladue Realty & Construction Company was organized by McCormack to take and hold title to the property, so as to protect the members of McCormack's family for the money they were to advance for the purchase of the property. The stock of the corporation was issued to McCormack and his family, as follows: 74 shares to defendant McCormack; 20 shares to McCormack's mother; 5 shares to McCormack's brother; and 1 share to A. R. O'Neil. No stock was issued to plaintiff.

When McCormack told plaintiff that members of his family would be officers of the corporation, plaintiff stated that it was perfectly satisfactory to him to work under that arrangement. At that time it was understood between plaintiff and McCormack that they were to share the profits fifty-fifty, and at the trial plaintiff testified that nothing was even said to amplify or modify that arrangement during the period of time he was on the property trying to sell or promote it. At that time defendant McCormack said to plaintiff: ''You just go ahead and do your job on this, and I will take care of these corporate shares and that sort of thing. Our understanding is exactly the same as it was at the outset, that we are to split our profit fifty-fifty, and I am depending on you to do the work as you originally agreed to do.'' After the preliminary survey heretofore mentioned was made, plaintiff and McCormack's lawyers drew up a set of restrictions to be applied to the subdivision, which were submitted to the zoning commissioner of the city of Ladue for approval, and after the approval of the plat of the property by the city of Ladue, plaintiff went to work in attempting to interest prospective purchasers in buying lots in the subdivision. Some advertising concerning the development was inserted in the daily newspaper. Plaintiff posted signs on the property, giving his name, telephone number, and the location of

his office. McCormack's name was not put on the signs. When the final contract of purchase was negotiated, plaintiff discontinued all his other real estate activities, and spent all of his time on the project. He was on the property every day, including Saturdays and Sundays, from ten to twelve hours a day.

It was late in the fall of 1938 before the plat had been accepted and plaintiff was in a position to start to sell the lots. By that time the weather was getting rough, and because there were no streets into the property, plaintiff was handicapped in not being able to show prospective purchasers certain locations in the interior of the tract. When spring came, McCormack decided he wanted to do some sewer work before attempting the road work, and as a consequence the property was considerably torn up, and plaintiff again was unable for several months to show the lots in the interior of the subdivision.

Two lots were sold shortly after the plat was recorded. Thereafter, plaintiff told McCormack that he thought it essential to get more homes in there at once, in order to further the sale of the property. With this in mind, plaintiff himself purchased from the corporation four lots, on which he subsequently built houses. Plaintiff also drafted a contract for the sale of an old house on the property, subject to restrictions of being improved. In all, from November 22, 1938, to the middle of the summer of 1940, plaintiff had sold two unimproved lots, the four houses that he personally had built, the lot with the old house on it, and also a house erected on the property by the Westland Corporation.

Plaintiff remained on the property from the time the plat was recorded in November, 1938, until sometime in August, 1940, when defendants notified him to move. During all that time, plaintiff continued to do the same type and amount of work above detailed. No other salesmen were on the job. Plaintiff did all the work himself. He spent money for advertising in the daily newspapers and paid for all the signs erected on the property, for which expenses he never was reinbursed. He also did some direct mail advertising, sending prospective purchasers photographs which he had taken. In all, he sent out from 500 to 600 pieces of mail.

Plaintiff testified that "McCormack always said that I had this contract up until the time in August (1940) when he notified me to leave the property." On one occasion, plaintiff spoke to Mr. Davis, the person from whom the property was bought, and asked Mr. Davis to get in touch with McCormack and try to straighten out their deal, so that plaintiff could go ahead without being handicapped with a lot of trivial arguments. Mr. Davis arranged for a conference in February, 1940, at which time Mr. Davis attempted to get plaintiff and McCormack together on a new selling contract, and suggested that they forget the original profit-sharing arrangement and make an agreement for plaintiff to work on a fifteen per cent commission

basis. Plaintiff rejected the idea, and told Mr. Davis he was not interested in altering the original agreement. On that occasion, McCormack said he would refuse to go through with the original agreement, which provided for a fifty-fifty split of the profits, because the deal was dragging along over a longer period of time than he had anticipated, and because he had put into the venture more money than he had expected to. After this conference, McCormack requested plaintiff to keep on working. Plaintiff remained on the premises until August, 1940, and showed the property to clients. He was on the property every day, Sundays and holidays included. McCormack was seldom there more than three or four days a week for an hour or so. Plaintiff was never paid for any of this work, either by McCormack or by the Ladue Realty & Construction Company, although he did receive a commission for the sale of the house he sold for the Westland Corporation.

The record shows that plaintiff acted as agent for the owners in selling this property to McCormack, and as such agent he collected a commission of $1500; that as a part of the arrangement between plaintiff and McCormack, this $1500 was to be put into the deal. However, the $1500 was never contributed to the project. McCormack asked plaintiff to put up the $1500 during the winter or early spring of 1939, but by that time plaintiff had spent the money and was unable to comply with the request.

The record also shows that it was understood between the parties that plaintiff would share in any of the losses of the enterprise. It also shows that on August 28, 1939, plaintiff tendered McCormack a check for $1500, and demanded that McCormack deliver to him fifty percent of the stock of the Ladue Realty & Construction Company; that in response to this demand, McCormack stated that he and his family had discussed the matter, and had decided that in view of the fact that they had put more money into the project than McCormack had originally anticipated, that they would retain control of the corporation and refuse the check.

The record further shows that plaintiff objected to other salesmen operating on the premises; that at one time plaintiff assaulted Arthur Goldman, a real estate agent and an officer of the Westland Corporation, which had built houses in the project, and on another occasion plaintiff requested Robert Rogers, a salesman who had brought a customer to view the property, not to show a lot on which plaintiff was working.

In August, 1940, plaintiff received a letter from the Ladue Realty & Construction Company demanding that plaintiff remove himself and his belongings from the premises. Plaintiff complied with this demand, thus terminating any further connection with defendants and the property in question.

Plaintiff testified that the reasonable value of the services he rendered in connection with the project in question was $15,000. Another witness put the value of plaintiff's services at $400 per month, plus expenses; and still another witness put it at $10,000 for two years' work.

The record shows that plaintiff, in his opening statement, while outlining his case to the jury, detailed the facts which he expected to prove, substantially as we have here stated them, and, in addition, among other things, said:

"The evidence will show Mr. McCormack and Mr. Pemberton went into a copartnership, where they would take on the buying of this property and developing it; Mr. McCormack, under the plan of operation, was to buy the tract of ground and finance the development, and Pemberton to spend his time in the supervision and laying it out, and development, and engage in the sale and improvement of it after the lots were acquired."

After plaintiff's counsel had completed his opening statement, counsel for defendants moved to dismiss the case, on the ground that on the facts stated it appeared that plaintiff was not entitled to recover. In making this motion, counsel for defendants stated:

"MR. AGATSTEIN: He has stated to the jury that there was a copartnership arrangement between the two of them. If that is what his evidence is going to show, and it is conclusively presumed that is what it will show, he is not entitled to recover on *quantum meruit*; it would have to be a suit for accounting. He does not plead that in his petition, but that nevertheless was the content of his opening statement. He clearly said there was a copartnership between the two of them, and then he says he wants to recover on *quantum meruit*. You can't do that.

"MR. HOESTER: If your Honor please, in my opening statement, I am aware of the rule that, of course, you must make a cause of action in that opening statement to the jury. I proceed on two counts on this. When I said 'copartnership' it was loosely used; it should have been a joint venture, and that is what we plead in count 1. In count 2 we plead a *quantum meruit* recovery. I say I am entitled to proceed on both counts, and elect to go to the jury on either count I want to.

"THE COURT: Objection overruled."

Plaintiff abandoned the first count of the petition, and submitted the case to the jury on the second count by two instructions which authorized a verdict for plaintiff if the jury found that plaintiff, at the special instance and request of defendants, rendered services in the development and promotion of the property in question. In both instructions the measure of recovery was such sum as the jury should find and believe from the evidence would reasonably compensate plaintiff for the reasonable value of the work and labor performed.

Appellants contend that the court erred in refusing to give and read to the jury the instructions in the nature of demurrers to the evidence offered by them at the close of the whole case, and in support of said contention argue that under the law and the evidence plaintiff was not entitled to recover either under the first count of the petition, which pleaded a breach of contract, or under the second count, which was a suit in *quantum meruit* for services rendered.

Since plaintiff abandoned the first count of the petition, and elected to go to the jury only on the second count, it will not be necessary to determine the propriety of the court's ruling with respect to the first count. The judgment appealed from, though general in form, must be deemed to be based upon the second count of the petition; therefore, we need only determine whether the court erred in refusing the peremptory instruction directed to the second count.

The facts in the case, as developed by plaintiff's testimony, and which we must accept as true, show that the parties entered into a partnership or joint enterprise agreement with reference to the development and sale of the property in question. Such being the case, it was improper to submit the case to the jury on the second count of the petition and thus permit a recovery for services rendered.

Although there was no express stipulation as to the duration of the partnership agreement, it was by implication to continue until all the lots in the subdivision were sold. The term of the agreement, therefore, had not expired when, according to plaintiff's evidence, defendant McCormack in August, 1940, wrongfully excluded plaintiff from the premises and thus caused a dissolution of the partnership. If plaintiff's evidence is true, then for this wrongful act plaintiff has a cause of action at law for breach of contract, or he might sue in equity for formal dissolution and accounting. In Karrick v. Hannaman, 168 U. S. lo. cit. 337, it is said:

"A partner who assumes to dissolve the partnership, before the end of the term agreed on in the partnership articles, is liable, in an action at law against him by his copartner for the breach of the agreement, to respond in damages for the value of the profits which the plaintiff would otherwise have received. [Bagley v. Smith, 10 N. Y. 489; Dennis v. Maxfield, 10 Allen, 138.] In a court of equity, a partner who, after a dissolution of the partnership carries on the business with the partnership property is liable, at the election of the other partner or his representative, to account for the profits thereof, subject to proper allowances."

See also: Zimmerman v. Harding, 227 U. S. 489, 33 S. Ct. 387, 57 L. Ed. 608; Delay v. Foster, 34 Idaho, 691, 203 Pac. 461; Bagley v. Smith, 10 N. Y. 489, 61 Am. Dec. 756; Skinner v. Dayton, 19 Johns (N. Y.), 513, 10 Am. Dec. 286; Burnstine v. Geist, 257 App. Div. 792, 15 N. Y. S. (2d) 48; Farwell v. Wilcox, 73 Okla. 230, 175 Pac. 936; Hill v. Palmer, 56 Wis. 123, 14 N. W. 20; 40 Am. Jur. 462.

But, in no event would the injured party be entitled to an action in *quantum meruit* for services rendered his partner. The reasons for so holding are well stated in Fitts v. Mission Health & Beauty Shop (Cal. App.), 208 Pac. 691, loc. cit. 693, as follows:

"In this case the plaintiff is not entitled to judgment on her seventh cause of action. By its plaintiff seeks to recover, not damages for breach of contract, but compensation for 'services performed by plaintiff for the defendants at their special instance and request.' In the count under consideration a remedy is sought to which plaintiff is not entitled under the facts of this case. By the terms of the contract she was a copartner with defendants, not an employee. She might have sued at law to recover damages for breach of contract. [Farwell v. Wilcox (Okla. Sup.), 175 Pac. 936, 4 A. L. R. 156.]

"In that event, assuming that the facts proved would justify a recovery, the measure of damages would be her loss of a share in the prospective profits of the enterprise. [Bagley v. Smith, 10 N. Y. 489, 1 Am. Dec. 756.] But plaintiff has not sued for damages, and she has failed to show that she is entitled to recover on a contract, express or implied, for services rendered."

The trial court erred in refusing to direct a verdict for defendants on the second count of the petition. Whether plaintiff should have a verdict in an action brought on a correct theory is not before us. We have accepted plaintiff's testimony as true merely for the purpose of passing upon the sole issue before us, i. e., whether or not the trial court should have directed a verdict on count two of the petition.

The judgment is reversed. *Hughes, P. J.,* and *McCullen, J.,* concur.