Betty Sue SHERIDAN et al.,
Plaintiffs-Respondents,

v.

James T. McBAINE et al.,
Defendants-Appellants.

No. KCD 28446.

Missouri Court of Appeals,
Kansas City District.

Feb. 27, 1978.
Motion for Rehearing and/or Transfer
Denied April 3, 1978.

Howard F. Sachs, Spencer, Fane, Britt & Browne, Kansas City, for defendants-appellants.

J. Turner Jones, Homer G. Watson, Columbia, for plaintiffs-respondents.

Before WELBORN, Sp. J., Presiding, SHANGLER, J., HIGGINS, Sp. J.

ROBERT R. WELBORN, Special Judge.

This action began in the Boone County Circuit Court as a suit to quiet title and for rent and possession of the premises. A corporate defendant, Windrush Corporation, counterclaimed for specific performance of an agreement by the decedent who had owned the premises to convey the property to the corporation in return for stock in the corporation. Defendant Thomas, who, with his wife, was defendant in the suit for rent and possession, alternately sought declaration that joint venture existed between himself and decedent with respect to the property and asked for an accounting, etc. Defendant Thomas also counterclaimed for value of work and labor on premises. Upon trial to court, judgment was entered quieting title as prayed for and for possession of premises with rent at rate of $166.67 per month from date of judgment until surrender of possession. Court found against corporate defendant on its counterclaim and against defendant Thomas on his claim of joint venture. Judgment was entered in favor of defendant Thomas for $13,953 for work and labor on the premises. Defendants Thomas and corporate defendant appeal.

At the time of his death in February, 1973, John Crane was the owner of 310 acres of land fronting on the Missouri River near Easley in Boone County. A small portion of the land was in the river bottom but the greater part was upland hill country, overlooking the river.

Crane built a house on the property around 1950 and lived there with his family of a wife and six children. They operated a dairy farm for a time and later raised beef cattle. Crane's wife died and he remarried in 1966 and moved to the residence of his new wife in Columbia. He continued to run stock on the farm until May, 1971, when he had a stroke.

Crane also worked as a night watchman at the University of Missouri beginning around 1957 or 1958. Presumably he then became acquainted with Dr. Lloyd B. Thomas, a professor of chemistry at the University. In 1969, Crane contracted to sell Doctor Thomas some 194 acres of the farm, but the transaction was not completed and Doctor Thomas forfeited $10,000 earnest money to Crane.

Doctor Thomas remained interested in the property. In December, 1971, Crane executed a "Request For Cost-Sharing" under the Rural Environmental Assistance Program for funds to construct a dam and lake on the property. The dam was intended to provide a road to make access to remote areas of the farm feasible. The application was in the name of "Crane and Thomas" and the address shown was that of Thomas's residence in Columbia.

Crane told his brother that he had been considering getting into a corporation with an unnamed person who would provide money for building a road and selling off part of the farm.

On July 5, 1972, Crane and Thomas executed a "Subscription Agreement" whereby they agreed to cause a corporation to be

known as "Windrush Corporation" to be formed. The Crane farm was to be sold to Windrush at a value of $80,000 for 800 shares of stock of the corporation. Thomas was to transfer stocks and bonds valued at $80,000 to Windrush in return for 800 shares of its stock. The subscription agreement was conditioned upon the adoption by Windrush at its first board of directors meeting of a "Plan To Offer Stock," incorporating the undertaking of the parties. The two concluding paragraphs of the "Subscription Agreement" read as follows:

"This agreement shall be binding upon the executors, administrators, heirs, and assigns of the parties hereto.

"This Subscription Agreement is hereby expressly conditioned upon the adoption by the corporation of the Plan described in paragraph 3 hereof, and if the corporation fails to adopt said Plan then this Agreement shall be of no effect."

On July 5, 1972, Crane and Thomas executed Articles of Incorporation for "Windrush Corporation." They were the incorporators. Thomas was designated registered agent and the registered office was the farm property. The articles authorized the corporation to hold, develop and sell real estate. A board of directors of two members was provided. The articles were filed in the office of the Secretary of State and a certificate of incorporation issued September 22, 1972.

On the same date that the articles of incorporation were executed, Crane gave Thomas an option to purchase three parcels of land totalling some 10 plus acres out of the farm. Crane had previously, on June 15, 1972, executed a warranty deed to the Thomases for one of the tracts covered by the option, containing 3.29 acres. That deed was recorded May 1, 1973.

The Thomases sold their residence in Columbia and, on October 1, 1972, they moved to the house on the Crane farm. The house had been occupied by a renter for six to eight months sometime previously. The prior tenants had left the house in bad repair, with many windows broken. Doctor Thomas had started working on the farm in the fall of 1971 and worked weekends on the grounds. In the spring of 1972, he began working on the house, restoring it to livable condition.

The abstracts to the farm were brought up to date as of October 16, 1972, and plans were made for the first meeting of the shareholders of Windrush. However, Crane suffered a second stroke in December, 1972, and died on February 25, 1973, about ten days before the date set for the meeting, and it was never held.

The Thomases continued to live and work on the farm. On September 23, 1973, demand for rent payment upon delivery of possession on behalf of the Crane heirs was served on the Thomases.

On December 28, 1973, quiet title action was filed by the Crane heirs, the children of Mr. Crane. Numerous defendants were named, including the Thomases and Windrush. A second count of the petition sought rent and possession against the Thomases. Only the Thomases and Windrush answered the petition. They filed a joint answer and counterclaim. By Count I of the counterclaim, Windrush asked for specific performance of the subscription agreement. By Count II, Doctor Thomas alleged an oral agreement with John Crane for a joint venture for the improvement and development of the farm. It prayed for an accounting and termination of the joint venture. By Count III, Thomas alleged that pursuant to agreement with Crane he had undertaken to improve the farm and had advanced in that regard work and materials valued at $25,590.15. Recovery of that amount was sought.

At the trial, a son of John Crane and the administrator of his estate, testified to his father's operation of the farm. His testimony minimized the work the Thomases had done at improving the house and the land. He testified that, after his stroke, his father told him that "Mr. Thomas was trying to get him into a corporation with him," but the witness knew nothing of what had been done in that regard.

On behalf of defendants, a brother of the decedent testified that his brother had discussed with him the formation of a corporation to develop and sell off part of the farm land.

Crane's widow, who had no interest in the farm by reason of an antenuptial agreement, testified as a witness for defendants. She stated that she had heard her husband and Thomas discuss construction of a dam on the farm. She knew about the formation of the corporation and stated that her husband had planned to attend the shareholders' meeting, but his stroke and death intervened.

Thomas and his wife testified in detail to the labor and materials provided by them on the farm beginning in December, 1971. According to Mrs. Thomas, the house was in bad shape, particularly the kitchen. They replaced about 20 broken windows. They made a "usable" kitchen, with sink and cabinets, and replaced the kitchen floor. They built screens and storm windows, painted the interior and replaced part of the roof.

Mrs. Thomas was aware of the formation of the corporation and knew that a date had been set for the first meeting of shareholders, but it was not held because of Crane's illness and death.

She said that some bulldozing had been done on the dam, but that the work had been stopped by one of Crane's sons. According to Ms. Thomas the dam was planned to permit construction of a road to the back part of the property which was to be developed for home sites. The Thomases were to provide the funds for improvement and development of the property.

Mrs. Thomas and her husband testified in detail to materials and machines and tools furnished by them in work on the farm and to 1740 hours work by Doctor Thomas and his son-in-law on the farm. Doctor Thomas testified that he held $80,000 in stocks at the time fixed for the first meeting of shareholders and that he still had the stocks at the time of trial, "holding it in escrow for the formation of the corporation."

Following the trial, the court entered judgment in favor of plaintiffs on Counts I and II of their petition, against Windrush on Count I of the counterclaim, against Thomas on Count II and in favor of Thomas on Count III. Thomas and Windrush appeal.

■ In the first point on this appeal, appellant Windrush argues that the trial court erred in refusing to order specific enforcement of the subscription agreement to convey property to the corporation in return for stock therein. The trial court is not to be found to have erred on this score. Apart from the absence of compliance with the expressed condition of the subscription agreement for approval by the corporate directors of the plan to offer stock (see 18 C.J.S. Corporations § 315, p. 814 (1939)), a very real problem exists in this regard because, although lack of capacity to sue was not pleaded, the corporate records of Windrush, placed in evidence without objection, reveal that the charter of that corporation was forfeited by the Secretary of State on January 15, 1974, for failure of the corporation to file its annual registration report and anti-trust affidavit. § 351.525, RSMo 1969.

Alternatively it is contended that the trial court erred in failing to grant relief under Count II of the defendants' counterclaim by which Doctor Thomas asserted the existence of a joint venture between himself and Crane with respect to the property in question.

■ The evidence clearly demonstrated that John Crane and Doctor Thomas had arrived at a definite agreement for the development of the Crane property, with Crane providing the land upon which an $80,000 value had been placed and Doctor Thomas providing the money for the project in the form of securities of a value equal to the value of the land. It is also clear, as argued by respondents, that the parties contemplated that a corporation would be employed as the operative entity. However, for reasons beyond the control of Thomas, the corporate structure was not perfected. That does not preclude the re-

lief sought by Thomas in Count II of the counterclaim. "[T]he legal relation which (corporate) promoters bear to each other, if there be more than one in equality of standing, is ordinarily that of partners or joint adventurers; * * *." 1 Fletcher, Cyclopedia of Corporations, § 191, p. 664 (1974 Revised Volume). See *Refrigeration Engineering Co. v. McKay,* 4 Wash.App. 963, 486 P.2d 304, 311[14] (1971); *Schuette v. Winternitz,* Colo.App., 498 P.2d 1183, 1185[5–7] (1972). Although as argued by respondents, Crane was disdainful of a partnership operation, nevertheless he entered into the arrangement with Doctor Thomas which the law considers a joint venture. An actual intention in that regard is not essential to a finding of a joint venture. *DeFabio v. Mackey,* 493 S.W.2d 355, 359[2] (Mo.App. 1973).

■ By the terms of the subscription agreement, Crane clearly intended a transaction which was to be binding upon his heirs, the respondents here. Respondents have advanced no equities which should stand in the way of the consummation of the transaction. They do assert the Statute of Frauds as a defense to any finding of a joint venture. However, the requirement of the statute with respect to lands is satisfied by the subscription agreement which describes the property involved, the consideration, the parties and it is signed by the parties. *Wheeler v. Blanton,* 253 S.W.2d 497, 499[1][2] (Mo.App.1952). The agreement of the parties to form a corporation, which gives rise to the joint venture finding, is likewise shown by the subscription agreement.

■ Respondents also argue that a finding of joint venture in the case is inconsistent with the rule that such an arrangement ordinarily exists for only a limited time, limited to a single, specific transaction, citing *Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5, 16[14–15] (Mo.1970). These are factors for consideration, not preclusive of the existence of a joint venture. Had the corporate arrangement been concluded, the joint venture relationship in this case would have terminated after limited duration.

However, in the circumstances of this case, its continued existence becomes necessary and does not refute the existence of the relationship.

The judgment of the trial court on Count I of plaintiffs' petition is set aside. Upon remand a new judgment on that count shall be entered, recognizing the interest of Doctor Thomas in the property as above determined. The judgment in favor of plaintiffs on Count II is reversed.

The judgment in favor of plaintiffs on Count I of defendants' counterclaim is affirmed. The judgment in favor of plaintiffs on Count II of defendants' counterclaim is reversed and the cause remanded for further proceedings in accordance with the prayer of defendants' counterclaim. Plaintiffs have not appealed from the judgment in favor of defendants on Count III of defendants' counterclaim. However, any accounting under Count II will necessarily take into consideration the recovery by defendants under that count.

Judgment affirmed in part; reversed and remanded in part for further proceedings.

All concur.