Betty Sue SHERIDAN; John Walter Crane; James Edward Crane; Joann Duncan; Joe Sparks Crane; Mary Jane Crane; Mary Frances Crane, Guardian of the Person and Estate of Carol Lee Crane, a minor; and James Edward Crane, Administrator of the Estate of John W. Crane, Deceased, Respondents,

v.

James T. McBAINE, Samuel W. Walkup, Turner McBaine, James B. McBaine, Swann Gower McBaine, James Patterson McBaine, Richard Hiram McBaine, Phillip McBaine, Mildred Elizabeth McBaine, Mary Deborah McBaine, Charles F. Taylor, Mary Etta Taylor, Elbert E. Taylor, Katie R. Taylor, James C. Turner, Eunice Y. Turner, George Buescher, Minnie Buescher, F.F. Ahmann, Ernestine E. Ahmann, James D. Dozier, Mary M. Dozier, J.S. Wiggans, Lucy A. Wiggans, Jacob Ranz, Jake Ranz, Duncan Ranz, J.M. Edwards, Tracy Edwards, J. Richard Griggs, and their unknown and unborn heirs and unknown grantees, consorts, representatives, devisees, spouses, successors and assigns; Mary Frances Crane; Lloyd B. Thomas; Marianne Moon Thomas; and Windrush Corporation, a Corporation, Appellants.

No. WD 33741.

Missouri Court of Appeals, Western District.

Aug. 23, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 15, 1983.

Application to Transfer Denied Dec. 20, 1983.

Darwin A. Hindman, Jr. and Hindman & Smith, Columbia, for appellants.

J. Turner Jones and Jones & Scott, Columbia, for respondents.

Before SOMERVILLE, C.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The trial court entered a judgment to terminate a joint venture, adjudged an accounting of the venture property, and after adjustment of the equities, ordered distribution to the several venturers. The order of the court was the response to our mandate in *Sheridan v. McBaine,* 564 S.W.2d 540 (Mo.App.1978). That opinion determined that a subscription agreement to convey property to a corporation in return for shares of stock bound the successors in interest to the subscribers as de jure joint venturers when the corporate purpose aborted upon the death of a subscriber.

The original protagonists Crane and Thomas, executed the subscription agreement with the purpose to form the Windrush Corporation to develop and sell an acreage. The plan was for Crane to convey his 310-acre farm to Windrush [valued at $80,000] for 800 shares of the corporate stock. Thomas was to transfer stocks and bonds of a like value for a like number of shares. These undertakings were conditioned on the adoption by Windrush of a Plan to Offer Stock. Crane and Thomas executed articles of incorporation for Windrush as incorporators, the certificate issued, but Crane died before a meeting of the shareholders could convene, and the Plan to Offer Stock was never adopted. Neither of the subscribers, Crane nor Thomas, ever transferred title to the land or securities to the corporation.

In furtherance of the corporation purpose, Thomas moved onto the farm after execution of the subscription agreement and made substantial repairs on the house. There is no doubt that this occupancy and renovation were legitimate corporation activity and expense. He continued that occupancy after Crane died, but soon afterwards the Crane heirs demanded rent and possession. The Crane heirs then sued to quiet title, for possession and rent. Thomas

counterclaimed for declaration of and dissolution of a joint venture and, separately, for reasonable value of labor and materials expended on the farmhouse repair. Windrush counterclaimed for specific performance of the subscription agreement.[1]

Our opinion in *Sheridan v. McBaine,* 564 S.W.2d 540 (Mo.App.1978) reversed the trial judgments for the plaintiffs on their petition, and reversed the denial of the Thomas counterclaim for declaration of a joint venture and for its termination and accounting. The rationale of opinion was that [l.c. 543[2–4]] the corporate promoters had come to so definite an agreement of purpose—to develop real estate contributed by Crane [valued at $80,000] with funds contributed by Thomas in the form of securities of like value—that they were in legal effect joint venturers to accomplish that purpose so that the disruption of that corporate end by the Crane death before the shareholders could approve the plan did not terminate the enterprise but bound the heirs, an intention clearly manifested by the subscription agreement. Thus, our mandate returned the cause to the trial court with direction for "further proceedings in accordance with the prayer of defendants' counterclaim"—to terminate the joint venture and for an accounting. That was the subject of the retrial—and is the subject of this appeal.

To lend perspective to the judgment we now review, the trial court on remand—as it was bound to do—gave effect to the court of appeals rationale that since the Crane death a joint venture subsisted between the two promoters to accomplish the defined, but unfulfilled, corporate purpose—and that they were bound to that enterprise. Thus, the trial court on remand confined the evidence to the obligations of the joint venturers to the enterprise, the performance of those obligations, and the redress of the equities between them. The court of appeals opinion implicitly holds that the subscription agreement and the incidental implementations of the corporate purpose by the promoters in anticipation of the formation of the Windrush Corporation as the operative unit defines the scope of the joint venture. The trial court on remand assumed those premises to come to judgment of termination of joint venture and accounting.

The subscription agreement [dated July 5, 1972]—one of the determinants of the obligations of the joint venture—imposed these performances on the signatories Crane and Thomas upon adoption by the Windrush Corporation of the Plan to Offer Stock at the first meeting of the Board of Directors of the Corporation—[an event never consummated because of the Crane death]:

"If the corporation adopts the "Plan to Offer Stock" as referred to in 3. above, each of the parties hereto agree to simultaneously transfer to the corporation an amount of property equal to Eighty Thousand Dollars ($80,000.00) each in accord with the three-year schedule as follows:

" 'Each of the parties hereto shall in the same transaction transfer to the corporation One-fourth (¼) of the total Eighty Thousand Dollars ($80,000.00) of property to be transferred by each and such transfer shall ocurr [sic] within one month following incorporation.—During the first year of incorporation, each of the parties shall in the same transaction transfer to the corporation a second One-fourth (¼) of the total property to be transferred by each. During the second year of incorporation, each of the parties shall in the same transaction transfer to the corporation a third One-fourth (¼) of the total property to be transferred by each. During the third year of incorporation, each of the parties shall in the same transaction transfer to the corporation a

---

1. The Windrush counterclaim for specific performance of the subscription agreement was denied by the trial court and that judgment was not disturbed on appeal. The court, on that first trial, approved the Thomas counterclaim for work and materials and awarded judgment for $13,953.00. That judgment was not appealed and, so, was not formally a subject of the court of appeals opinion.

fourth One-fourth (¼) of the total property to be transferred by each.'

"Each of the parties shall receive from the corporation in exchange for the property transferred common stock of the corporation equal in value to the property transferred and in accordance with the above three-year schedule. By written agreement of the parties hereto, the schedule of transfer of property may be accelerated provided that any such accelerated transfer shall be made by both parties in the same transaction.

"This agreement shall be binding upon the executors, administrators, heirs, and assigns of the parties hereto."

The subscription date was July 5, 1972. Crane died on February 25, 1973, before the Windrush Corporation could convene a meeting to adopt the subscription agreement Plan to Offer Stock. Thus, Crane never transferred title of the 310–acre farm to the corporation, and Thomas never transferred any securities. Thomas did, however, on November 1, 1972, direct his stockbroker to transfer specified stock—$39,983 in value—to the corporation. The corporation was without officers, so those shares remained owned by Thomas. Thereafter, on November 24, 1973, Thomas sold some of those shares and retained the funds.

There were other, actual, performances to further the joint venture purpose and incidental to the original corporate intention. Thus, Thomas took possession of a house on the Crane farm soon after execution of the subscription agreement and remained for four years—until November of 1976. In the course of that tenure, Thomas made certain repairs and expended sums for improvements.[2] There were also rents collected by Thomas and emoluments to the Crane heirs from some uses of the property after the Crane death. The judgment on remand—which we discuss presently—adjudi-cates each to come to the encompasses accounting.

As we noted, in November of 1973 Thomas sold 50 shares of Petrolite stock—among those shares Thomas specified to the broker in November of 1973 to set aside for transfer to the Windrush Corporation—and used some of the funds to pay a margin debt and retained the balance.

The trial court on remand entered findings of fact and conclusions of law as prelude to judgment: among them, (1) "since February 25, 1973, the date of the Crane death, the heirs have wrongfully refused to perform their obligations under the agreement,[3] and as a result, have delayed the consummation of the agreement from that date"; and, (2) "Thomas has from the time of the entering of the joint venture agreement to now, always been ready, willing and able to perform his obligation under the agreement." It is evident that the judgment assumes and contemplates that the joint venture remained a subsistent enterprise until the rendition of that very judgment of termination and accounting. In that, the court was mistaken.

■ The court of appeals opinion determines that the two corporate promoters, Crane and Thomas [l.c. 543[2–4]] had concluded a "definite agreement for the development of the Crane property" whereby Crane undertook to contribute the land [assigned value of $80,000] and Thomas undertook to provide the means for the development in the form of shares equal to the value of the land. The opinion determines also [l.c. 544] that the legal relation between them as corporate promoters was that of joint venturers, so that when the consummation of the corporate structure—and hence the device to operate the enterprise—failed upon the death of Crane, the

---

2. Thomas counterclaimed for the value of those expenditures and services in the original trial and was awarded $13,953.00. That judgment—Count III of the counterclaim—was not appealed. The court of appeals opinion [l.c. 544] enjoined the circuit court on remand that "any accounting under Count II [the subject of the remand] will necessarily take into consider-ation the recovery by defendants under that count."

3. It is not clear whether *agreement* means the terms of the subscription document or some more encompassed understanding between Crane and Thomas.

transaction continued to subsist as a joint venture by the very intention of the subscribers. The court of appeals determined also [l.c. 544[6]] that "the interest of Doctor Thomas in the property" should be noticed on remand. That is the law of the case which—in the absence of mistake or failure of justice by the court of appeals—concludes the circuit court on remand, and concludes us on review. *Swain v. Anders,* 349 Mo. 963, 163 S.W.2d 1045, 1048[1, 2] (1942). Thus, cognately, the court of appeals adjudicates only that [l.c. 544] the "continued existence [of the joint venture] becomes necessary," but does not undertake to say for how long, but implicitly leaves that necessary predicate for the accounting to the evidence on remand and to the effect of legal principle. *In re Marriage of Eden,* 621 S.W.2d 331, 332[2, 3] (Mo.App.1981).

■ A joint adventure is an association of persons to carry out a single business enterprise for profit, for which purpose they combine property, effort, skill and knowledge. *Denny v. Guyton,* 327 Mo. 1030, 40 S.W.2d 562, 571[7–13] (banc 1931). The relationship arises only from contract, but the agreement may be established without formal terms, and implied from circumstances that such an enterprise was in fact entered into. *Southwest Drayage Co. v. Crawford Moving Vans, Inc.,* 377 S.W.2d 293, 297[2–5] (Mo.1964). The uncertainty in the duration, or want of some definiteness of the details of enterprise, does not undermine the relationship where the intention to enter the adventure is established. *Scott v. Kempland,* 264 S.W.2d 349, 354[2–8] (Mo. 1954). In the usual circumstance where no date is fixed in the agreement for the consummation of the joint venture, the relationship continues to subsist until the purpose of the enterprise is accomplished. *Morrison v. Caspersen,* 323 S.W.2d 697, 702[2] (Mo.1959).

■ A joint adventure and a partnership are kindred in characteristic and are governed by the same rules of law. *Denny v. Guyton,* supra, l.c. 572; *Allison v. Dilsaver,* 387 S.W.2d 206, 210[1, 2] (Mo.App.1965). Thus, the principle that a partnership dissolves upon the death of any partner unless the articles of agreement provide for continuance [§§ 358.310(4) and 358.180, RSMo 1978; *Hidden v. Edwards,* 313 Mo. 642, 285 S.W. 462, 468[10] (1926) also governs that exigency of the coadventurer relationship. *Allison v. Dilsaver,* supra, l.c. 210[1, 2]. Thus, also, coadventurers are bound by the same fiduciary obligations and standard of conduct as the law expects between partners. *Denny v. Guyton,* supra, l.c. 570; *Scott v. Kempland,* supra, l.c. 354[2–8].

■ It is evident from these precepts that the obligations between Crane and Thomas continued until the joint venture ran its course, unless earlier dissolved by conduct in derogation of such a subsistent relationship. *Cazel v. Alledine,* 360 Mo. 1, 226 S.W.2d.729, 730[2, 3] (1950). The Crane heirs contend that the joint venture dissolved on the Crane death, so that the judgment on remand, which premises that the venture continued until that rendition was erroneous. The court of appeals opinion determines [l.c. 544[5]], however, that the terms of the subscription agreement "clearly intended a transaction which was to be binding upon his [the Crane] heirs," and so transcends the usual principle that death dissolves such a relationship. That is the law of the case, and no longer an open issue.

That the joint venture was dissolved *thereafter,* and was not a subsistent transaction until the rendition of judgment as the adjudication of the court on remand supposes, is not the precluded law of the case, but remains an issue open to us.

■ The obligation of both Crane and Thomas to perform, first as promoters of the corporation and then—when that purpose was no longer possible—as joint venturers, was defined in the subscription agreement. Crane was to convey a 310 acre farm to the enterprise, and Thomas, securities of an equivalent $80,000 value. The agreement called for a simultaneous performance as assigned by a three-year schedule: (1) a concurrent transfer by each of one-fourth of the property within one

month of the incorporation, (2) another one-fourth within the first year of incorporation, (3) another one-fourth within the second year of incorporation, (4) and the final one-fourth during the third year of incorporation. Thus, performance was contingent upon *incorporation.* That contingency was met: Windrush was duly incorporated and the certificate issued from the Secretary of State on September 22, 1972.[4] The question becomes, then, what obligations matured as to each venturer and in favor of the other?

■ The subscription agreement was executed on July 5, 1972. The first performance [contribution of one-fourth of the total property] was due within one month of September 22, 1972, the date of incorporation. Neither party performed. On November 1, 1972, Thomas directed his stockbroker to transfer *specified* shares of stock —$39,983 in value—to Windrush. The corporation was without officers, so these shares remained owned by Thomas. That gesture was meant to comply with the first two obligations of performance: contribution of one-fourth of the property shares [of the value of $20,000] within a month of incorporation and a like contribution within one year of the event. There was no duty by Crane, of course, to perform the second obligation until September 21, 1973.[5] On November 14, 1973, Thomas sold 50 shares of Petrolite Corporation stock, among those

he had directed the broker to transfer from a personal account to the Windrush Corporation as the gesture of performance of the first two stages under the subscription agreement. There is no suggestion that Thomas consulted with the Crane heirs about the transaction [Crane had died in February of 1973]. Thomas treated the proceeds as his own and used some of the funds to liquidate a margin debt. The shares of Petrolite, among the others Thomas marked for performance of the subscription agreement, were assets of the joint venture at the time of disposition, and the sale of that asset by one joint venturer without voice of the other, evinced an intention by Thomas to abandon the relationship. We conclude, therefore, that the Crane heirs and Thomas were bound to those performances due each other under the subscription agreement—until November 14, 1973.

The coventurer Thomas argues, however, that the only obligation under the subscription agreement was to contribute $20,000 worth of stock at each of the four stages of the performances called for by the subscription agreement—and not any specified shares. Thomas argues, rather, that his only obligation under the agreement was to have in readiness stock in the value of $80,000 to ensure full performance—a resource always "in reserve" and available.

4. Thomas understood *incorporation* to mean "when the corporation became active, elected officers, [so that] it was within one month of that the [initial one-fourth of] the stock was to be transferred." The officers were never elected—thus, to assume that sense for *incorporation* as used in the subscription agreement would require conclusion that the obligation of neither coventurer to perform ever árose. We determine, rather, that the Windrush was *incorporated* on September 22, 1972, upon the issue of the certificate.

The performance was contingent upon yet another, precedent, event: adoption by the Windrush Corporation of the Plan to Offer Stock [the subscription agreement undertaking by Crane and Thomas to contribute the acreage and shares in exchange for the Windrush Corporation shares]. That contingency was never met, simply because the Crane death intervened, the Board of Directors was never consti-

tuted, and the Plan to Offer Stock was never adopted. We conclude that the failure of the corporation to approve the Crane-Thomas scheme of stock purchase does not affect the obligation of the Crane heirs and Thomas as *de jure* coventurers, but merely defined the rights and duties of the subscribers *inter sese* as corporate promoters—a status which lapsed upon the Crane death. The September 22, 1972, date—when the certificate of incorporation issued—therefore, remains the reference for performance of obligations under subscription agreement.

5. The subscription agreement, in express terms, imposed concurrent performance—*in the same transaction.* The unilateral and premature performance by Thomas of the second contribution cannot determine, therefore, the timeliness of the Crane performance or even what performance was then due from him.

To be sure, the subscription agreement obligates Thomas to contribute, by the stages defined, $80,000 in stocks—undifferentiated as to kind—as the consideration for the Windrush Corporation shares. Whatever the general obligation under the subscription agreement, Thomas was obligated to contribute shares of a certain value at each stage, and there was no performance possible by Thomas without contribution of *specific shares*—that was the only means of compliance open to him. There may have been purpose between Crane and Thomas to liquidate some of the shares for ready cash, but that does not alter the fact of the obligation of agreement—an obligation Thomas acknowledges was fully intended—that his performance was by the contribution of stock. In a word: Thomas claims as one coventurer who has performed against the property of another coventurer who has not performed. To sustain claim, Thomas must show performance, and that can be shown only by property already delivered or intended for delivery to the venture—in this case, shares subject to description. That is to say, by shares committed for performance due—a property sequestered to the joint venture. That the incapacity of the Windrush Corporation to take ownership thwarted the actual transfer of the shares so that the title remained in Thomas does not mean the property did not, in equity, become an asset of the joint venture. *Dierks & Sons Lumber Co. v. Bruce,* 239 S.W. 133, 134 (Mo.1922). In such a case the coventurer who holds title becomes trustee for the other adventurers. 46 Am.Jur.2d, *Joint Ventures* § 40 (1969).

The letter by Thomas to the stockbroker was a clear direction to transfer from a personal account, and to set aside for the joint venture purpose, the stocks specified—50 shares of Petrolite among them. That letter expressed clearly also the Thomas intention to consult with his "partner" Crane for his agreement "to set up an account for the Corporation with [the stockbroker] to take care of the stock . . . We may want to raise cash from sale of some stock or to use the stock as collateral for a loan to raise cash on a fairly short term basis." The reference was to the *stock described*—the 50 shares of Petrolite among them—as well as to the other shares which the continued Thomas performance of the subscription agreement would contribute. These directions amounted to a sequestration of these very described shares as property given in performance of the subscription agreement stages one and two, divested from Thomas and invested as equitable assets of the joint venture. The sale of the Petrolite shares thereafter, without consultation with the Crane heirs, amounted to a disposition of the joint venture assets for a private purpose, and evinced an intention to abandon the enterprise. *Cazel v. Alledine,* 360 Mo. 1, 226 S.W.2d 729, 730[2, 3] (1950); 48A C.J.S. *Joint Ventures* § 17 (1981).

It may be, as Thomas argues, that the Crane heirs refused to cooperate with the joint venture and actually resisted that enterprise. That does not excuse Thomas from a faithful stewardship of the joint venture property committed, but still retained. The sale of the Petrolite shares, already marked as assets of the venture, and the use of the proceeds for a personal debt was a breach of fiduciary duty to the Crane heirs as to that property. *Denny v. Guyton,* 327 Mo. 1030, 40 S.W.2d 562, 590[26, 27] (banc 1931); *Scott v. Kempland,* 264 S.W.2d 349, 354[1] (Mo.1954); 2 R. Rowley, On Partnership § 52.23 (1960). That conduct was also inconsistent with a continued joint venture, amounts to a declaration that Thomas was no longer bound by the contract, and manifests intention to abandon the venture. 2 R. Rowley, On Partnership § 52.38 (1960). On either ground Thomas has no equity to assert against the Crane heirs after that date.

We conclude, therefore, that after November 14, 1973, when Thomas converted the enterprise Petrolite stock to his own use, the joint venture was abandoned and there was no obligation of further performance under the subscription agreement. The joint venture terminated. The measure of the equity of each, Thomas and the

Crane heirs, against the venture property still held by the other is the performance due the joint venture by each by that date—November 14, 1973. The first two stages of performance had accrued by November 14, 1973.[6] Thus, the Crane heirs owed the joint venture conveyance of one-half of the 310-acre farm, and Thomas owed the shares of stock specified for that purpose—each in the value of $40,000.

The circuit court judgment, therefore, which orders the Crane heirs to convey the entire 310 acreage to the joint venture and for Thomas to contribute $80,000 worth of stock [the shares enumerated in the November 1, 1972, direction to his stockbroker included] to the enterprise rests on the premise that the venture continued to subsist until the rendition of judgment, and is erroneous. A proper judgment requires the Crane heirs to convey to the venture an undivided one-half interest in the full 310 acreage and for Thomas to transfer the shares enumerated in the November 1, 1972, direction to the stockbroker—the shares of Petrolite [now proliferated to 200 by stock splits] among them—as well as any increments of the other enumerated shares by stock splits, and also the dividends issued on those enumerated shares from November 1, 1972, when they became joint venture assets together with legal interest until distribution.

The parties fashioned their contentions on appeal on the premise of the judgment entered. Our reversal of that judgment dispels a number of those points, and they do not require response.[7]

The judgment contemplates that the joint venturers, the Crane heirs and Thomas, specifically perform their subscription agreement obligations in favor of the joint venture. Our opinion does not cavil that specific performance of the subscription agreement was not due from each of the venturers, but merely determines that the obligations of agreement terminated when Thomas converted the joint venture stock to personal use, so that the performance due was only to the extent of the first two stages. The judgment contemplates also that once conveyed to the joint venture, the property be given to the possession of a designated receiver for sale and distribution—after the offset against each venturer of other sums due the joint venture and after credit to each venturer for other sums due from the joint venture.

■■■■ The judgment included in its calculus, paragraph 7a, a credit for $13,953 due Thomas under the Count III counterclaim of the original litigation, adjudicated in favor of Thomas and not appealed. It was a recovery the original court of appeals opinion enjoined the circuit court [l.c. 544] to "necessarily take into consideration" on the remand to terminate the joint venture and accounting. The Crane heirs make an argument that the Count III counterclaim judgment encompasses major items of equipment—such as a tractor and truck—which are rightful assets of the joint venture, and which the circuit court on remand

---

6. The third contribution was not due from either of the subscribers—from what we make of it—until September 21, 1974.

7. The circuit court found that Thomas was always ready, willing and able to make full performance, so that full performance was also due from the Crane heirs. On that premise, the judgment orders the Crane heirs to convey the entire 310 acres [assigned an $80,000 value] to the joint venture and Thomas to transfer the designated shares [valued at something less than $40,000] and also [somewhat more than] $40,000 in cash to the joint venture. The court then ordered that thereupon the joint venture dissolve, the designated receiver possess the property for sale and distribution. The judgment then charges each, the Crane heirs and

Thomas, for sums due to the joint venture, and credits each for sums due from the joint venture to come to a final distribution of the assets.

We determine that the joint venture terminated after the second phase of performance, so that only the equivalent of $40,000 was due from each venturer—one-half of the acreage from the Crane heirs and the designated shares from Thomas. Thus, the points raised as to the impropriety of the judgment that the Crane heirs convey more than one-half of the acreage to the joint venture for sale and distribution and for contribution by Thomas of the additional cash sum of $40,000 for distribution, become irrelevant.

should have ordered Thomas to transfer to the joint venture as an incident of that credit. The counterclaim was adjudicated on the first trial, was never appealed, so that the subject matter of that judgment is now beyond the reach of review. There is no reason to suppose, as the Crane heirs would have it, that the $13,953 judgment includes the sums for the tractor and truck purchases by Thomas used to tend the farm property, and we adopt no such assumption. The counterclaim judgment was properly entered as a credit in favor of Thomas due from the joint venture. In the accounting and distribution, that judgment on Count III of the counterclaim shall bear interest at the legal rate from the date the original judgment was entered. *In re Thomasson's Estate,* 192 S.W.2d 867, 870[4–6] (Mo.1946); *Oliver v. Love,* 104 Mo.App. 73, 78 S.W. 335, 337[4] (1904); § 408.040, RSMo 1978.

The judgment included also a credit of $1292.70 in favor of Thomas due from the joint venture. The Crane heirs contend that determination was error. The court found that for a period of time Thomas collected rents on the farm house in the sum of $3,355 and incurred expenses of $4,697.70 in that connection, and gave judgment to Thomas for $1,292.70 as a credit due from the joint venture for the net expenses. The Crane heirs contend that, on the analogy of partnership law [§ 358.180], a venturer is not entitled to remuneration for conduct of the joint venture business. They contend that the joint venture was dissolved by the Crane death, and hence Thomas thereafter acted without authority and may not be reimbursed. They contend that in any event Thomas acted as a volunteer, and that whatever services he performed were without their consent.

■ The preponderance of the $4,697.70 offset found by the trial court against the rents collected by Thomas was not a remuneration, but actual expenditure. That credit does include a claim by Thomas for 250 hours of labor done at a charge of $3 per hour. Thomas went on to the farm property with the knowledge and consent of Crane. The house was dilapidated. Thomas worked regularly and on weekends to restore the house. There is basis to infer, in the circumstances, an intention by Crane and Thomas that the joint venture would pay Thomas a modest sum for that extra labor. *Ashbaugh v. Sims,* 483 S.W.2d 80, 83[2, 3] (Mo.App.1972). The contention that the joint venture dissolved when Crane died, of course, is dispelled by the court of appeals opinion. It was perpetuated by the express intention of the parties and is the only reason a remand and successive review occupy us. The judgment that Thomas has a credit due from the joint venture of $1,292.70 for those net expenses—to be given account in the final distribution—rests on substantial evidence and was properly entered.

The judgment enters other credits and charges for and against the joint venturers. They are not disputed on this appeal and shall be enforced on the distribution of the liquidated assets in a manner consistent with the frame of judgment that the joint venture terminated on November 14, 1973. The judgment also names a receiver to possess the joint venture property, wind up the affairs, and make distribution according to the terms of judgment. The litigants do not dispute that designation or authority, and do not ask our review.

The parties contend other errors, however, not as to what the judgment renders, but as to what it does not.

■ Thomas contends that the court should have allowed an additional credit of $800 against the joint venture. Thomas and Crane applied for a Rural Environmental Assistance Program payment of $800 for a water impoundment reservoir. The dam was necessary to reclaim certain land for development. The application was allowed, the work began, but was discontinued at the insistence of the Crane heirs. Thomas contends the Crane heirs should be charged with that $800 sum lost to the joint venture by their conduct. The evidence on that issue, however, was altogether sketchy and too inconclusive to support a determination of loss to the joint venture. The court did not err to refuse the contention.

The Crane heirs contend also that the trial court failed to adjudge there was due the joint venture from Thomas a sum as rent for the occupancy of the Crane farm home from February 25, 1973, through November 16, 1976,[8] at the rate of $166.67 per month, found by the court on the first trial to be the reasonable rental value of the premises. Thomas, we iterate, moved into the farmhouse on October 1, 1972. He undertook repairs even before then, but continued that work after occupancy. The occupancy and reconstruction were with the consent and knowledge of Crane. Crane also agreed that the cost of the work was a legitimate corporate expenditure. Thomas left the premises on November 13, 1976. The property was leased thereafter.[9] The joint venture terminated on November 14, 1973. It is clear that a partner who, after dissolution, carries on the business with partnership property is liable, at the election of the other partners to account for any profits. *Pemberton v. Ladue Realty & Construction Co.,* 237 Mo.App. 971, 180 S.W.2d 766, 771[4–7] (1944). The Thomas occupancy from the very first, however, was not an incident of the venture business, as such, but as a base of operations. The occupancy after November 14, 1973, was as a caretaker. To be sure, after that date Thomas abandoned the venture, but that does not mean that he forfeited any equity already accrued against the Crane acreage by performance already made. The Crane heirs wrongfully refused to recognize any Thomas interest in the property. They sued to eject Thomas from the premises and to collect rent for that occupancy.[10] Thomas was not obliged to relinquish that interest, even after he abandoned the formal purposes of the venture. The Crane heirs by their obstinate refusals of any obligation

under the subscription agreement after the Crane death abandoned the joint venture long before the Thomas default. Our opinion does not find the Crane heirs faultless, but only that Thomas may not insist upon any further performance by the Crane heirs after November 14, 1973, when Thomas himself abandoned the venture.

A joint venture, as does a partnership, continues a de facto existence even after conventional dissolution until the debts are paid and the assets collected and distributed. *Schneider v. Newmark,* 359 Mo. 955, 224 S.W.2d 968, 971[2–6] (1949). The conventional dissolution of a joint venture, moreover, does not have any effect upon the ownership of the partnership property [unless the contract of dissolution provides, a condition not present]. *Ober v. Indianapolis & St. Louis Railroad Co.,* 13 Mo.App. 81, 83 (1882). At the time Thomas abandoned the enterprise, an undivided one-half of the Crane acreage was subject to the equity of the joint venture. The title to the property, however, remained in the Cranes, so that the interest of the joint venture was only inchoate and presumably unknown to third persons. The Crane heirs threatened almost immediately after the Crane death to sell the farm property, although Thomas objected and declared he was ready to perform fully the subscription agreement. There followed a demand for rent and for possession of the premises from Thomas. The occupancy by Thomas thereafter was a legitimate means to protect the joint venture against the threat of the coventurer to sell the enterprise property, and to abide the formal liquidation of the venture. That occupancy, in a functional sense, was involuntary. That Thomas derived an incidental benefit from that use does not suffice, in

8. The Crane heirs' contention, once again, assumes that the joint venture dissolved when Crane died on February 25, 1973. It terminated, rather, on November 14, 1973. The claim for rent, we assume, extends from the supposed dissolution until Thomas terminated occupancy. That date, however, was November 13, 1976, and not the 16th.

9. There were $2,955 in rents paid thereafter. It is not apparent who was the final recipient of

that money. In response to inquiry at the second trial: "All the money has come to you?" Thomas answered, merely: "Yes."

10. Judgment for the Crane heirs on that count in the original suit was reversed outright by the court of appeals [l.c. 544] which enjoined that on remand "the interest of Doctor Thomas in the property" be recognized.

the enforced circumstances, to impose a detriment in the nature of rent. The contention is denied.

The cause is remanded to the circuit court with directions to enter a judgment consistent with our determination that the joint venture terminated on November 14, 1973. The circuit court is directed, accordingly, to enter a judgment that the Crane heirs convey to the joint venture by fee simple title an undivided one-half interest in the 310-acre farm property and that Thomas transfer to the joint venture the corporate stock set aside by Thomas to the enterprise on November 1, 1972, and specified in the circuit court judgment.[11] The joint venture shall thereupon be dissolved and a receiver appointed by the circuit court shall take possession of the property to wind up, liquidate the assets of the joint venture under the direction and approval of the court, and then to distribute the net proceeds equally between Thomas and the Crane heirs, subject to the charges due the joint venture from each and credits due each from the joint venture.

The circuit court judgment shall charge Thomas as due to the joint venture:

1. One Thousand One Hundred Eighty-five dollars [$1,185.00] together with interest at the legal rate from March 1, 1976 until distribution [proceeds from 78 shares of Manpower stock— shares set over by Thomas to the joint venture on November 1, 1972— paid to Thomas on March 1, 1976, for the stock in connection with a corporate merger].

2. All cash dividends paid on the corporate stock set over by Thomas to the joint venture on November 1, 1972 and specified in the circuit court judgment with interest at the legal rate until distribution.

The circuit court shall credit as due to Thomas from the joint venture:

1. Thirteen Thousand Nine Hundred Fifty-Three Dollars [$13,953.00], the recovery under Count III of the counterclaim, with interest at the legal rate from the date of the entry of the original judgment.

2. One Thousand Two Hundred Ninety-Two Dollars Seventy Cents [$1,292.70] for net expenses incurred to rehabilitate the house on the Crane property.

The circuit court is directed also to determine the disposition of the $2,955 paid to Thomas as rentals on the farm property for years 1977, 1978 and 1979. If money was retained by Thomas, a proper judgment must show one-half of the sums so received as a charge against Thomas due the joint venture with interest at the legal rate from the dates the rents were received and one-half of the sums received as a credit due the Crane heirs with interest at the legal rate from the dates the rents were received.

The circuit court judgment has adjudicated that the Crane heirs have collected a net income of Two Thousand Six Hundred Thirty-four Dollars Thirty-eight cents [$2,634.38] from the date of the Crane death [February 25, 1973] until December 31, 1979.

The circuit court is directed to determine the net sum received by the Crane heirs in addition after December 13, 1979, and shall charge the Crane heirs as due to the joint venture:

1. One-half of all net farm income received by the Crane heirs together with interest at the legal rate from the dates the income was received.

The court of appeals decision set aside Count I of the Crane heirs petition to quiet title of the farm property in them. The direction of the court of appeals on remand was that the circuit court enter a new judgment on that count [l.c. 544]: "recognizing

---

11. (1) 179 shares of Emerson Corporation [Skil Corporation merged with Emerson].
(2) 200 shares of Standard Oil of New Jersey.
(3) 208 shares of Exxon.
(4) 236 shares of Getty Oil Corporation [Mission Oil Company merged with Getty].
(5) 168 shares of Dow Chemical.
(6) 200 shares of Petrolite.
(7) Any and all stock split shares and stock dividend shares issued on the foregoing shares of capital stock until the closing of the sale of the stock as directed by the judgment.

the interest of Doctor Thomas in the property." This the judgment on remand neglects to do, so that Count I of the Crane heirs petition remains unadjudicated.

The circuit court is directed to enter a judgment on Count I of the petition which quiets title to the land described in paragraph 4 of that count in the Crane heirs plaintiffs and against all defendants except the interest of the joint venture in an undivided one-half of the described land.

The circuit court on remand has authority to allocate the real estate taxes paid on the farm between the joint venture and the Crane heirs, to order the joint venturers to deliver documents of title and other papers in order to facilitate the receiver to wind up the affairs of the joint venture, to allow the receiver a reasonable fee, to order the payment of costs from the joint venture assets, and to enter any reasonable order necessary to accomplish a distribution of the joint venture assets our opinion adjudicates.

The cause is remanded to the circuit court for the further proceedings directed.

All concur.